Filed 11/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B255008 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA392191) |
| YOUNG LEE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Henry Hall, Judge. Affirmed.

Cyn Yamashiro and Philip Kent Cohen for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Noah P. Hill and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

A jury convicted defendant Young Lee of assault with a deadly weapon, and found true an allegation that defendant personally inflicted great bodily injury on the victim, a homeless man whom defendant beat with a tire iron. Defendant was sentenced to seven years in state prison.

On appeal, defendant contends the trial court erred in denying his motion to suppress evidence. He also contends the court erred in refusing to exclude the victim's civil attorney from the trial; in limiting cross-examination of the victim for financial bias and in refusing to permit defendant to offer certain other impeachment evidence; and in denying a pinpoint instruction on financial bias. None of these contentions has any merit, and we affirm the judgment.

## FACTS

### 1. The Circumstances of the Crime

On June 15, 2011, at about 5:15 p.m., Donald Bolding, a homeless man, was panhandling near the Vermont Avenue off-ramp of the 101 Freeway. He approached a Range Rover that was stopped at a traffic signal. Defendant was the driver, a woman was in the front passenger seat, and several persons were in the rear seats. Mr. Bolding asked defendant for spare change. Defendant made a gesture with his hand indicating Mr. Bolding should move away. Mr. Bolding asked again, twice, with the same result. During this encounter, Mr. Bolding heard defendant say something derogatory. He (Mr. Bolding) pulled up the hoodie he was wearing, exposing a tattoo on his stomach depicting a male and a female in a sexual position.

According to Mr. Bolding, defendant "[took] off and [made] a left on the red [light]." While Mr. Bolding was talking to the woman in the next car, the woman said, "Watch out." Mr. Bolding turned around and defendant hit him with a tire iron, and told him to "[g]et on your hands and your knees and apologize." Defendant hit him again, and again demanded an apology. Mr. Bolding's head was bleeding and he "backpedaled . . . down the ramp." The two men – defendant and "a little short guy" – were "trying to corner [him]." Eventually, Mr. Bolding and the two men were in the middle of Vermont

2

Avenue. The two men were coming toward Mr. Bolding, who was weaving in between cars, trying to get away. "Somehow, some way I ended up . . . on the other side of Vermont," stumbled on the curb and fell into a fence. "That's when [defendant] and the other gentleman caught me," and "finally made me apologize," by "beating me until I said it."

Several persons came to Mr. Bolding's aid in one way or another.

Robert Edwards and his wife were stopped at a signal for the freeway on-ramp, and saw defendant and another man run past their car, and onto the off-ramp. The two men "disappeared for a second," and then they reappeared. Mr. Edwards then saw the victim, with the two men "chasing him all through the cars . . . ." The victim "was going from car to car. They were going around and around and finally there's no cars on the opposing side of the street. [¶] So then they chased him across the street to the fence and that's when they started beating him and kicking him." "[Defendant] had a tire iron in his hand and he was beating him with the tire iron."

Mr. Edwards got out of his car, and ran across to the men, "[b]ecause I thought [defendant] was trying to kill the guy." The victim "got down into a ball to protect himself," crouching down with his arms over his face, "[j]ust trying to protect himself." When Mr. Edwards ran up to the men, he said to defendant, "What the f--- are you guys doing? [¶] And that's when they stopped kind of beating him. And he, the defendant, said, 'he showed my wife an obscene tattoo.' "

Mr. Edwards called 911, and the two men started running up the street. After checking on the victim, Mr. Edwards chased the two men while he was on the 911 call. He followed them up the street, around a corner and up a hill, and when he got to the top of the hill, saw them getting in a vehicle. He tried to catch them, but they were gone.

A woman in an SUV (see *post*) came up to Mr. Edwards and gave him a piece of paper with the license plate number of the vehicle she saw them get into, and Mr. Edwards gave the license plate number to the 911 operator. He returned to the scene of the crime and gave police officers there the information he had.

About a month later, Mr. Edwards identified defendant from a six-pack photographic lineup as the one who assaulted Mr. Bolding with the tire iron. During his confrontation with the two men, Mr. Edwards was "almost face-to-face" with defendant, and "totally focused on him" because he was "the guy with the tire iron," and "I wasn't going to turn my back to him." Mr. Edwards could see defendant "[p]erfectly" when he was face to face with him. There was a significant height difference between defendant and his companion, with the defendant the taller of the two.

Alicia de la Cruz also saw the incident. She was driving northbound on Vermont Avenue when she saw the victim walking backwards and two Asian men, one taller than the other, walking towards him. The taller one had a black stick in the back of his pants. When they got to the other side of the street, Ms. de la Cruz saw the victim on his knees and the taller person swinging the black stick up and down. She thought no one was helping, and went to the gas station on the corner. She got out of her car, ran to the scene, and yelled that she was going to call the police. Mr. Edwards was already there. Then the two men ran away. Ms. de la Cruz ran back to her car and drove after them. They ran for a couple of blocks, and she saw them get into a silver Range Rover, one in the front passenger seat and the other in the seat behind the driver. She wrote down the license plate number, and followed them for a few blocks to make sure of the make and model of the car.

Cassie Lee was in her car at the intersection on Vermont Avenue near the freeway. She saw a homeless man about 13 feet away from her. The man started to run, and two Korean men chased him. One of them was holding "something like a stick in his hand." Ms. Lee called 911. Ms. Lee later identified defendant, from the photographic six-pack, as the person who was holding the stick.

In addition to bleeding from the blows to his head, Mr. Bolding suffered a "nightstick fracture" of his left arm (so named because medical personnel frequently saw that kind of fracture in patients who were protecting their upper bodies or faces while being hit with a nightstick).

4

None of the witnesses to the incident saw Mr. Bolding act aggressively toward defendant.

## 2.     The Investigation

Officer Samantha de la Roca, along with an officer who was training her, responded to a call to the crime scene.  Mr. Bolding was "very disoriented," "screaming in pain," and "didn't know what was going on."  Officer de la Roca did not take notes, but later prepared a report.  Mr. Bolding said at the scene "that the suspect with the tire iron was the passenger of the car," not the driver.

Using the license plate information from Ms. de la Cruz, investigators tracked the silver Range Rover to a rental agency.  Defendant had rented the car a few days before the assault on Mr. Bolding, and the day after the assault, he exchanged it for a BMW. Police recovered a tire iron from the rear trunk compartment of the Range Rover.

Officer Yusoff Thaimas was assigned to the case several days after the incident. He interviewed some of the witnesses to the assault, but could not locate Mr. Bolding until six months later, in December 2011.  Officer Thaimas then interviewed Mr. Bolding, who was in county jail on drug charges.  Mr. Bolding told the officer that the driver was wielding the tire iron, and he was positive that the taller man was the one striking him with the tire iron and the shorter one was punching and kicking him.  At the interview, Mr. Bolding identified defendant from the photographic six-pack, first saying he was 85 to 95 percent sure, and then that defendant had "lost weight," but "he was sure it was him."

In December 2011 defendant, who was abroad, was informed police had issued a warrant for his arrest.  Detective Alan Solomon spoke to defendant's lawyer on January 3, 2012, and on January 16, 2012, defendant was arrested on his arrival at Los Angeles International Airport.

Two weeks later, Judge Shelly Torrealba issued a warrant authorizing a search of the house in Malibu where defendant was residing at the time of his arrest.  The warrant authorized a search for two specifically described firearms; any other firearms or weapons defendant was prohibited from legally possessing; ammunition and gun-related

items and paperwork; any items tending to establish the identity of persons with dominion and control over the premises or items to be seized; "news articles, written information, videos regarding the current assault-with-deadly-weapon investigation involving Victim Donald Keith Bolding"; any cellular telephones and electronic communication or storage devices belonging to defendant and any computers "that may further this investigation by way of audio, video and photographic data storage" contained in them.

When police executed the warrant, several persons were present at the house with defendant, one of whom was Joo Hwan Shon. Mr. Shon was handcuffed until after the house was secure, but was told he was not under arrest. Detective Ken Yueng told him the police were looking for weapons, and also asked Mr. Shon if he knew of the assault on Mr. Bolding and whether he (Mr. Shon) was a passenger in the car. Mr. Shon said he knew of the crime, was not in the car, but knew a person (David Lee) who was a passenger in the car. Mr. Shon gave the detective David Lee's contact information. During the search, police found ammunition, but no guns.

Detective Solomon called David Lee and left a voicemail message, but did not receive a return call. Detective Solomon eventually spoke to David Lee more than a year later, in April 2013.

### 3. Pretrial and Trial Proceedings and the Verdict

On May 20, 2013, defendant filed a motion to quash the search warrant and for a *Franks* hearing.[1] (A *Franks* hearing is an evidentiary hearing at which a defendant challenges the veracity of the affiant's statements supporting a facially valid search warrant.) The trial court held the *Franks* hearing and quashed the search warrant, but denied defendant's suppression motion, concluding the prosecution was "not precluded from using the witness who they found by talking to someone else at the premises." (We will recite the facts relating to the warrant in connection with our discussion of defendant's claims, *post*.)

---

[1] *Franks v. Delaware* (1978) 438 U.S. 154, 155-156 (*Franks*).

6

David Lee testified at defendant's trial. He was with defendant in the Range Rover on the date of the crime. He was in the rear seat with two women and another man (his nephew, Toyoon Jin). Defendant was driving, and defendant's fiancée was in the front passenger seat. David Lee testified that Mr. Bolding approached the car, demanded money and displayed his tattoo. Defendant's fiancée was shocked when she saw it. An argument started, with both Mr. Bolding and defendant raising their voices. Mr. Bolding approached the front of the car "and he started finger pointing to the ladies who were inside the car," making "a gesture having sex." When the signal changed, defendant turned left, drove one or two blocks away, and parked the car "in an emergency space or something." Defendant was very upset. Defendant and Mr. Jin got out of the car. Defendant walked toward the trunk, and David Lee heard the trunk open.

David Lee was not sure how long the two men were gone. When they returned, the group resumed their journey, with David Lee driving the car. (He had moved the car to a parking spot across the street from the place defendant had left it.) Defendant said "he was with the homeless [man] and he beat him up . . . ." "The words [defendant] said was something to the effect of the homeless [man] deserved to be beaten." When they arrived at the house in Malibu, David Lee saw defendant wiping something resembling a tire iron, "a tool that came out of the trunk of the car," with a piece of cloth.

Defendant told David Lee "not to report this to the police," and "if I do he would cut my – my child's, my mother's, my own and my wife's throat." Defendant threatened to kill David Lee "five or six times at least" in connection with this case.

The jury found defendant guilty of assault with a deadly weapon, and found the great bodily injury allegation true. The court sentenced defendant to the maximum term of seven years, citing several aggravating factors: the extreme violence, the use of a weapon, a particularly vulnerable victim, and the ample evidence that defendant attempted to intimidate David Lee.

Defendant filed a timely appeal.

## DISCUSSION

Defendant raises several claims of error. None of them has merit.

7

**1.      The Motion to Suppress David Lee's Testimony**

Defendant contends the trial court should have suppressed David Lee's testimony as the fruit of an illegal search.  Specifically, defendant asserts that the detective who prepared the search warrant for defendant's Malibu residence "drafted a misleading affidavit" that "purposefully omitted information that would have otherwise rendered the affidavit stale and lacking in probable cause," and that the prosecution failed to prove the detective acted in good faith reliance on the invalid warrant.

We conclude, to the contrary, that the trial court erred in quashing the search warrant.  There was probable cause to issue the warrant, and no proper basis for holding a *Franks* hearing in the first place.

**a.      The facts**

The pertinent facts are these.  Detective Ken Yueng executed the affidavit supporting the search warrant.  The affidavit described the assault on Mr. Bolding, the investigation, and defendant's arrest, and stated that the affiant was assigned to conduct a background investigation of defendant.  In doing so, Detective Yueng discovered that in 2001, defendant was arrested and convicted for misdemeanor possession of a firearm and felony possession of narcotics.  In 2007, his criminal convictions were expunged, but he was prohibited from legally owning any firearms under Penal Code section 1203.4.

Using the police department's computer system, Detective Yueng found that defendant had two firearms currently registered to him.  The detective confirmed both registrations with another officer assigned to the LAPD's Gun Unit.  He also verified defendant's "prohibited status" in records of the California Department of Justice, "via the Armed Prohibited Persons System."  Detective Yueng opined, "[b]ased on [defendant's] current gun registrations and his prohibited person status," that he "is probably in possession of the guns that are currently registered under his name, thereby constituting a felony violation" of Penal Code section 29800.

Detective Yueng requested the search warrant be granted "in an effort to recover the illegally possessed handguns from [defendant]."  As to the premises to be searched, the affidavit noted that after his arrest, defendant told Detective Solomon "that he was

8

currently residing at the above Malibu residence, which is currently listed for sale. DMV record also substantiates such a claim."

The sole basis for defendant's motion to quash the warrant was that the affidavit supporting it "contained material omissions without which the lack of probable cause would have been apparent to the issuing magistrate." Specifically, Detective Yueng knew, but failed to inform the magistrate, that the two guns were registered to defendant in 1995 – almost 17 years earlier – while he was living at a different address in Los Angeles. Defendant attached to his motion a copy of the printout from the Automated Firearms System (AFS) relied on by Detective Yueng, reflecting the dates and address. This showing, defendant contended, mandated a *Franks* hearing.

The trial court (Hon. Edmund Willcox Clarke, Jr.) agreed, stating: "[M]any of us would understand that guns are not always possessed by the person who registered them over the course of their life. They're lost. They're stolen. They're sold, or they're stored at a different location, et cetera. So as far as I'm concerned, it's obvious that one would want to know something about how current information is on the guns."

The court's ruling precipitated four hearings and extensive examination of Detective Yueng. Among other things, defendant sought to show the detective acted in bad faith and sought a warrant for the guns as "a pretext just to get into [defendant's] home seven months after this assault had occurred." The prosecutor sought to show there was no deliberate or reckless omission, and in any event the detective had a good faith belief in the validity of the warrant.

In the end, the court quashed the warrant "based on the insufficiency of the affidavit," a conclusion apparently founded both on the registration date and failure to show the Malibu home was defendant's "long-term residence." However, the court ultimately refused to suppress David Lee's testimony, observing that the affidavit was not "so insufficient that other reasonable officers wouldn't have served it and thought that it was reasonably issued"; Detective Yueng had "no evil intent" in his presentation of the affidavit; and the court could not find "flagrant abusive conduct, such that I'm going to exclude access to a witness."

9

**b.      The law and this case**

**i.      The *Franks* hearing**

The trial court erred at the onset when it allowed defendant to challenge the veracity of the affiant's statements, because defendant did not make the "substantial preliminary showing" that is the prerequisite for a *Franks* hearing.  (Cf. *People v. Estrada* (2003) 105 Cal.App.4th 783, 790 ["Because of the difficulty of meeting the 'substantial preliminary showing' standard, *Franks* hearings are rarely held."].)

The governing principles are these:  "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  (*Franks, supra,* 438 U.S. at pp. 155-156.)  If the defendant proves the allegation of perjury or reckless disregard at the *Franks* hearing, the false material must be set aside, and if the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded.  (*Ibid.*)

The same principles apply to material omissions.  (*People v. Eubanks* (2011) 53 Cal.4th 110, 136 ["A defendant can challenge a search warrant by showing that the affiant deliberately or recklessly omitted material facts that negate probable cause when added to the affidavit."]; see also *People v. Kurland* (1980) 28 Cal.3d 376, 385 [omissions are material if they render the affidavit substantially misleading, that is, "if, because of their inherent probative force, there is a substantial possibility [the omitted facts] would have altered a reasonable magistrate's probable cause determination"].)

As *Franks* emphasizes, its rule is of "limited scope . . . in regard to . . . when a hearing on allegations of misstatements must be accorded."  (*Franks, supra,* 438 U.S. at p. 167.)  *Franks* summarized:  "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant."  (*Id.* at p. 171.)  For that reason, "[to] mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be

10

allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." (*Ibid.*) Further, "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." (*Ibid.*) And, when the allegedly false representations are set aside – or, in this case, when the omitted information is included – "if . . . there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." (*Id.* at pp. 171-172.)

These principles required defendant to make a "substantial preliminary showing" both that the information was omitted deliberately or "with reckless disregard for the truth" and that the information omitted was material – that is, "necessary to the finding of probable cause." Defendant made neither showing.

First, defendant's "offer of proof" consisted of evidence that Detective Yueng knew defendant purchased the guns almost 17 years earlier (the registration records showed this), but he did not put that information in his affidavit. No other proof was offered. We fail to see how this suggests, much less proves, that Detective Yueng acted in "reckless disregard for the truth." (*Franks, supra,* 438 U.S. at p. 171.) Defendant entirely failed to comply with the *Franks* mandate to furnish reliable statements (or any other evidence) to support his allegations of reckless disregard for the truth (or, as he asserts on appeal, that the detective "purposefully omitted information").

The salient point in the affidavit was that, at the time the warrant was sought, the guns were registered to a person whose possession of them would constitute a felony. Defendant offered no declaration or other evidence that he had disposed of the guns, or that he had lost them, or that they were stolen, or that the registration was in any way inaccurate. Indeed, the only documentation defendant filed with his motion for a *Franks* hearing (other than the search warrant) also showed that two *different* guns defendant had purchased in the past had been destroyed. Thus defendant's own "offer of proof" showed he knew how to dispose of guns, and thus supported the inference he likely still had possession of the guns currently registered.

Second, and similarly, defendant made no showing that the date he purchased the guns was necessary -- or, for that matter, even relevant -- to the magistrate's finding of probable cause. Here, the omitted purchase date has no "inherent probative force." (*People v. Kurland, supra,* 28 Cal.3d at p. 385.) It makes no difference whether defendant was entitled to possess the two guns when he registered them in 1995, or that he resided in Los Angeles at that time. The pertinent fact is that he was later prohibited from possessing guns due to his 2001 conviction, yet they were still registered to him. In the absence of any evidence that he no longer possessed the guns at his Malibu residence, and in light of the evidence that they remained registered to defendant, we see no substantial possibility that a reasonable magistrate would have altered the probable cause determination. Current registration records created "a fair probability" (*Illinois v. Gates* (1983) 462 U.S. 213, 238) that the guns would be found in defendant's home.

Defendant insists the warrant was based on "stale information." We reject the notion that gun registration records are "stale" unless they show the gun purchase was recent. Probable cause to believe a firearm possession crime has occurred cannot be dependent on how long ago – or how recently – a felon purchased a gun. The warrant here was based on current registration records showing no sale or other disposal of the guns, and on defendant's current status as a person whose possession of the guns would constitute a felony. The omission of the registration date simply was not material.

Further, it is no great leap to infer that the most likely place to keep a firearm is in one's home. "It is not essential that there be direct evidence that [items sought in a warrant] will be at a particular location. Rather, the magistrate ' "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." ' [Citation.]" (*People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1315; cf. *McDonald v. City of Chicago* (2010) 561 U.S. 742, 780 [referring to Second Amendment right to keep and bear arms for lawful purposes, "most notably for self-defense within the home"].)

In sum, defendant made no "substantial preliminary showing" that the information about the date he purchased the guns was deliberately or recklessly omitted from the

affidavit.  Nor did defendant show the omitted information was material, that is, necessary to a showing of probable cause.  As a consequence, there was no basis for a *Franks* hearing, and the court erred in allowing defendant to challenge the veracity of Detective Yueng's affidavit.

          c.       **There was probable cause to issue the warrant, and the court erred in quashing it**

As will be clear from the above discussion, we are in no doubt there was probable cause to issue the warrant – that is, "a fair probability" that "evidence of a crime" (the guns defendant is prohibited from possessing) would be found "in a particular place" (defendant's Malibu residence).  (*Illinois v. Gates, supra,* 462 U.S. at p. 238.)  As we have seen, the guns were registered to defendant, who was not legally entitled to possess them; it is reasonable to infer that guns are likely to be kept in the home; defendant told police after his arrest that he currently resided at the Malibu address; and the affidavit stated that "DMV record also substantiates" that defendant resided there.

Because there was probable cause to issue the warrant, it was error to quash it. Defendant insists this is not so, pointing out the affidavit was "devoid of any facts to suggest that [defendant] had used, been seen with, or made reference to possessing a gun after his 2001 felony conviction," and therefore there was "no probable cause to believe the guns would be at the Malibu residence."  The trial court took the same tack, apparently concluding that the magistrate could not reasonably infer, from current registration records, that defendant still had the guns, and in addition that the warrant did not sufficiently show that the Malibu home was his "long-term residence."  This was error.

The trial court failed to assess the affidavit in a "commonsense and realistic fashion."  (*United States v. Ventresca* (1965) 380 U.S. 102, 108.)  The court agreed with the prosecutor that "it's not unreasonable to conclude that [defendant] didn't sell [the guns] or dispose of them, that he's still controlling them in some way if they're still registered to him."  Yet the court went on to distinguish "control" and "possess[ion],"

13

stating that "possess[ing] them" was "slightly different." The court observed that "I don't see anything that puts [defendant] in contact with any of these guns," and "he registered them long before it was illegal to possess them, and no one said that he's ever touched them after he got convicted." The court ignored the evidence that current records also showed that defendant did not dispose of the guns after he was convicted, which is prima facie evidence he continued to possess them. Where the crime is illegal possession of a firearm, current records showing defendant remained the registered owner after his conviction is sufficient to establish "a fair probability" that he currently possesses them.

The trial court also criticized the police concerning the lack of information in the affidavit about the ownership of the Malibu home. (We reiterate: The affidavit stated that defendant told Detective Solomon "that he was currently residing at the above Malibu residence, which is currently listed for sale. DMV record also substantiates such a claim.") The court found a distinction between "currently residing" and a "long-term residence," stating: "And I don't mean to parse it too much, but I interpret '. . . . residence' as slightly different than he is currently residing there. Currently residing there means that's where he lays his head. Residence means to me that he lives there on a longer-term basis. [¶] It's a small point, but we have a short period of time, we have someone who has flown back from a foreign country, and I don't know who owns the residence from what I see here. This could be the residence of Mel Gibson. . . . But for all this affidavit tells me, this could be owned by someone other than the defendant, and he is residing there with that person's permission, which would make me a little uncomfortable issuing a warrant to go into that person's house because the defendant is residing there."

Further, the court said: "[J]ust reading this, why would I not conclude that the defendant resides in Korea and stays with someone in Malibu when he's in the United States with the permission of that person, uses it as a local address and registers his vehicles there?" And: "Aren't there records of ownership of this premises available to the police? Can't you go to the county recorder and find out who is the registered owner of the property? Could you call a real estate agent and say, 'I'm interested in buying that

14

house. Who is listed as the owner?' Can't you just make a minimal effort to confirm that the house you are about to go into belongs to a person that you are trying to search, as opposed to someone else?"

In our view, the trial court did indeed "parse [the affidavit] too much." It is settled law that the magistrate must make "a practical, commonsense decision" whether, under all the circumstances described in the affidavit, there is "a fair probability" that evidence of a crime will be found in a particular place. (*Illinois v. Gates, supra,* 462 U.S. at p. 238; cf. *United States v. Ventresca, supra,* 380 U.S. at p. 108 ["affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area"].)

The trial court entirely lost sight of any "commonsense and realistic" construction of the detective's affidavit. Defendant told police he "currently resided" at the Malibu address, and the affidavit stated that "DMV record also substantiates such a claim." The trial court stated it would "use my English degree" to conclude it was "not at all clear as to what that [phrase] modifies," and asked, "[t]he DMV record also substantiates what claim?" This was improper. The affidavit's meaning is quite clear that a DMV record substantiated defendant's statement about his current residence – and we fail to see the relevance of the court's concern over whether or not defendant owned the Malibu home.

The reviewing court's duty is "simply to ensure that the magistrate had a 'substantial basis for [concluding]' that probable cause existed." (*Illinois v. Gates, supra,* 462 U.S. at pp. 238-239.) In this case, the magistrate did, and the trial court erred in concluding otherwise. (Cf. *People v. McDaniels* (1994) 21 Cal.App.4th 1560, 1565 ["The lower court's analysis can only be viewed as 'hypertechnical' and it manifests the 'grudging or negative' attitude toward search warrants which both the United States Supreme Court and our Supreme Court have condemned."].)

Our conclusions on the points discussed above obviate any need to consider defendant's contention that the trial court erred when it declined to suppress David Lee's

testimony. We do note, however, that the court found no "evil intent" in Detective Yueng's affidavit. ("[T]he detective didn't write Moby Dick, he wrote a short story – and a weak one – but with no evil intent, that I can discern, in the way he presented it.") Further, defendant's hyperbolic assertions on appeal that the warrant authorized a "general, exploratory search," and that the warrant was used "as a subterfuge to search for evidence of an unrelated crime" are belied in the first case by the warrant itself, and in the second case by the principle that an ulterior motivation does not invalidate the legal justification for a search. (*People v. Carrington* (2009) 47 Cal.4th 145, 168 [" 'once probable cause exists, and a valid warrant has been issued, the officer's subjective intent in conducting the search is irrelevant' "].) There was nothing improper in the police questioning of Mr. Shon, and others present during the search, concerning their knowledge of the assault on Mr. Bolding, and defendant cites no pertinent authority suggesting otherwise.

### 2. The Motion to Exclude the Victim's Lawyer

Defendant contends the court's refusal to exclude Mr. Bolding's civil attorney from attending the trial was an abuse of discretion and structural error, because it "created a risk that the two would share information and that the integrity of the trial would be compromised." There was no error.

#### a. The facts underlying defendant's claim

Mr. Bolding filed a civil lawsuit against defendant in May 2012. During jury selection in this case, defense counsel sought to exclude Mr. Bolding's attorney, Gary Casselman, who had been in court that day and the previous afternoon, from continuing to attend the trial. Counsel argued Mr. Casselman might prepare Mr. Bolding for his testimony based on opening statements or testimony from other witnesses; that defense counsel would be unable to question Mr. Bolding "about information passed on to him by his counsel . . ."; and that Mr. Casselman was a "potential witness." Counsel conceded the court "has a rather wide range of discretion" and there was a "balancing test between the public's right to an open trial versus the due process rights of the defendant," but

16

asserted that his inability to question Mr. Bolding about his conversations with counsel made due process considerations paramount.

The court refused to exclude Mr. Casselman, observing that "I don't see how Mr. Casselman is a potential witness," and "we have to have some faith that Mr. Casselman is going to act as an appropriate officer of the court." The court stated: "I'll remind Mr. Casselman that he's not to discuss anything that he hears or that he has an obligation not to discuss anything that he hears in open court with his client. Just knowing what I know I suspect that he and Mr. Bolding don't talk all that often, but I think that excluding him would be structural error and I'm not going to do it."

Later in the trial, at the end of a day of testimony, defense counsel asked the court whether he could "point out that Mr. Bolding has an attorney present in the courtroom." The court stated, "I'll think about that. I don't think that's particularly relevant. . . . [¶] . . . I don't think that impeaches Mr. Bolding unless you can somehow or another link up the fact that the fact the attorney was here . . . that that somehow or another impacted his testimony . . . ." Defense counsel explained his position further and concluded: "I'll leave it at that. Thank you for your consideration tomorrow."

The next day, on direct examination after the lunch recess, Mr. Bolding testified that he had met with an attorney and understood he had a lawsuit pending against defendant, but had not read "what that lawsuit is about" and had not seen "any paperwork in connection with it." On cross-examination, counsel asked Mr. Bolding if, as he was leaving for the lunch break, he "gave a thumbs up." Mr. Bolding answered affirmatively, and counsel asked "Who did you do that to?" Mr. Bolding replied, "[t]he gentleman in court," who was "Casselman," the "gentleman in the front row." Mr. Bolding also confirmed that this was the same gentleman who, while Mr. Bolding was testifying earlier, "was seated right in [Mr. Bolding's] direct view over the shoulder of juror number 50." Defense counsel then asked if that was Mr. Bolding's lawyer, and the court sustained the prosecutor's objection, telling defense counsel to "[m]ove on to something that's relevant in this case."

17

Then, at the mid-afternoon break, defense counsel asked the court to "reconsider the ruling regarding identifying Mr. Casselman," contending that doing so was not prejudicial and "helps to flesh out the bias . . . ." The court refused to change its ruling, observing the defense could impeach Mr. Bolding with the fact of his lawsuit against defendant, but that his lawyer's presence in court "remains irrelevant."

On continued cross-examination the next morning, defense counsel asked Mr. Bolding if he had spoken with his attorney after his testimony the previous day, and Mr. Bolding asked "[w]hich attorney," saying "[t]here's the district attorney and there's Mr. Casselman." Mr. Bolding said he had talked to Mr. Casselman, "who represents [him] on the civil suit . . . ."

On redirect examination, the prosecutor asked why Mr. Bolding had sued defendant, and Mr. Bolding responded, "Well, doctor bills." Defense counsel objected, asserting at a sidebar that he had been "precluded from getting into the relationship between [Mr. Bolding] and his attorney." The trial court ruled that it would sustain all further objections to any discussion about the lawsuit under Evidence Code section 352, as "not worth the time being spent on it already."

### b.    The law

Defendant contends that allowing Mr. Casselman to remain in court created a "strong likelihood that the attorney would become a potential witness and potentially communicate with the victim." Because there was "no way to determine what was said between the victim and Casselman or what the victim's testimony would have been without Casselman present," Casselman's role in the trial's outcome was "necessarily unquantifiable and indeterminate," creating a structural error that is reversible per se.

First, as we explain *post*, there was no error at all, much less structural error. Indeed, most constitutional errors are not structural. Structural defects are those that " 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' " (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149.) Thus structural errors include such things as denial of counsel, denial of the right of self-representation, denial

of the right to public trial, and so on. (*Ibid.*) An error in the refusal to exclude a member of the public from a trial is not a structural error. (Cf. *People v. Bradford* (1997) 15 Cal.4th 1229, 1322 [finding denial of motion to exclude witness-victims was not prejudicial].)

Second, the refusal to exclude Mr. Casselman was not an error of any kind.

The trial court has the statutory authority to exclude witnesses (Evid. Code, § 777), and also may exclude a victim (defined to include the victim of the offense and one person of his or her choosing) from a criminal proceeding (Pen. Code, § 1102.6, subds. (b) & (c)). But a victim may be excluded only if he or she is subpoenaed as a witness (*id.,* subd. (d)), and otherwise only under certain conditions, including that the person seeking to exclude the victim "demonstrates that there is a substantial probability that overriding interests will be prejudiced by the presence of the victim" (*id.*, § 1102.6, subd. (b)(1)). Overriding interests may include the defendant's right to a fair trial. (*Id.*, subd. (b)(1)(a).)

Similarly, the right to an open public trial – a shared right of the accused and the public (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552) – "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial," but "[s]uch circumstances will be rare . . . ." (*Waller v. Georgia* (1984) 467 U.S. 39, 45.) The party seeking closure "must advance an overriding interest that is likely to be prejudiced . . . ." (*Id.* at p. 48.)

The parties agree that the exercise of the court's authority to exclude witnesses and members of the public from the trial is subject to review for abuse of discretion. Here, there was none. Defendant failed entirely to show "a substantial probability" that his right to a fair trial would be prejudiced by the presence of Mr. Casselman.

*People v. Griffin* (2004) 33 Cal.4th 536 (*Griffin*) is instructive. There, the court found no abuse of discretion when the court, under former section 1102.6 of the Penal Code, granted the prosecutor's motion to permit the presence in court of two witnesses who were victims as defined by the statute (the murder victim's mother and sister). "In light of the circumstances, the trial court reasonably determined that the presence of [the

19

two witness-victims] would not pose a 'substantial risk of influencing or affecting the content of any testimony.' [Citation.]" (*Griffin,* at p. 574.) The court continued: "Nothing before the trial court at the time it made its ruling suggested that [the witness-victims'] presence posed a substantial risk that either woman would craft or shape her own testimony, or cause any other witness to do so, as a result of her presence." (*Ibid.*)

Significantly, *Griffin* stated: "[D]efense counsel asserted only that such a risk existed, *but an assertion of this sort is insufficient to support a claim that the trial court abused its discretion* [citation]. Further, although we review the trial court's ruling on the basis of the record of the proceedings before it at the time the ruling was made, we note that subsequent events do not suggest that either [witness] tailored her testimony on rebuttal to conform with what she had learned from being present at trial . . . . In addition, subsequent events do not support any inference that either [witness-victim], by her presence, caused any other witness to give testimony different from what the witness otherwise would have given . . . ." (*Griffin, supra,* 33 Cal.4th at p. 574, italics added.)

This case is analogous. Defendant contends there was a "strong likelihood" Mr. Casselman would "become a potential witness and potentially communicate with the victim." On the contrary, nothing before the court suggested a substantial risk that Mr. Casselman would share information with Mr. Bolding about the testimony of other witnesses. The court reasonably relied on Mr. Casselman's status as an officer of the court and on the court's own reminder that Mr. Casselman should not convey information to Mr. Bolding. Defendant's "concern" that Mr. Casselman would ignore his obligations is not enough.

In sum, as in *Griffin,* defendant's mere assertion that a risk existed does not suffice. And defendant's claim that "[t]his risk appeared to be realized" when Mr. Bolding made his "thumbs up" gesture is likewise nothing but speculation, not a showing of a substantial risk of collusion. (See *People v. Tully* (2012) 54 Cal.4th 952, 1006 [referring to the emphasis in California Supreme Court decisions "that the substantial risk referred to be real, not speculative or hypothetical"]; *People v. Bradford, supra,* 15 Cal.4th at p. 1322 [the defendant's mere assertion that the witness-victims

20

"*could or would be* influenced by the opening statements was insufficient to establish that the victims' presence posed 'a substantial risk of influencing or affecting the content of any testimony' "].)  There was no abuse of discretion.

**3.    The Claims of Error in Evidentiary Rulings**

Defendant contends the trial court improperly limited evidence impeaching Mr. Bolding in two respects.  We find no error.

**a.    Financial bias**

Defendant contends the trial court erroneously limited cross-examination of Mr. Bolding on his financial bias.  He contends that Mr. Bolding's story "changed after the filing of his civil lawsuit," and complains the court prevented him from pursuing the line of questioning about Mr. Casselman's presence in court and the "thumbs up" incident.  The trial court also abused its discretion, defendant contends, when it ultimately precluded, under Evidence Code section 352, all further questioning on the civil lawsuit.  If the defense had been able to explore the issue, defendant contends, the jury would have heard evidence that Mr. Bolding knew "of the lawsuit's specifics" and that his purpose in filing was not solely to seek payment of medical bills.  This limitation "eviscerated [defendant's] principal case theory," which was that the other assailant had the tire iron and Mr. Bolding "was exaggerating to improve his chances of a large civil settlement."

There was no abuse of discretion in the trial court's rulings.  As is apparent from our recitation of the pertinent facts (*ante*, part 2.a.), despite the court's ruling that Mr. Casselman's presence in court was irrelevant, Mr. Bolding effectively identified Mr. Casselman both as his lawyer in the civil suit and as the person to whom Mr. Bolding made the "thumbs up" gesture.  (As the trial court pointed out during a discussion of the bias issue, "Mr. Casselman has been identified for the purpose of this jury.")  And, the court's ruling to end further discussion of the lawsuit came after the prosecutor said that his question on redirect examination, about why Mr. Bolding initiated the lawsuit, was intended to elicit a response of "because the guy beat me up with a tire iron."

In short, both the fact of Mr. Bolding's civil suit and his lawyer's presence at the trial were presented to the jury.  We can see no abuse of discretion in the court's

conclusion that the further consumption of time in questioning Mr. Bolding about his purpose in filing the suit, or his knowledge of the details of the civil complaint, outweighed the probative value of such testimony. Defendant's claim that the ruling "vitiated an entire defense theme" is simply wrong, as is confirmed by counsel's closing argument to the jury: "This is a man long before any result in this case has already filed a civil lawsuit against [defendant]. He has an attorney here every day. Do you think this man may be motivated to shift, to color his testimony by money? [¶] . . . [¶] . . . Do you think he may be motivated by this civil lawsuit against the only person out of the two who's here?" There was no error.

### b. Mr. Bolding's alleged assault on a jail inmate

The defense also sought to present evidence about an assault on another inmate that occurred while Mr. Bolding was incarcerated ("the Smith assault"). At the preliminary hearing, Mr. Bolding testified he knew nothing about the Smith assault and denied punching or kicking Mr. Smith. Defense counsel had evidence that a sheriff's investigation had determined Mr. Bolding assaulted Mr. Smith. The defense wanted to impeach Mr. Bolding's credibility by presenting testimony from Mr. Smith to show Mr. Bolding lied under oath about the assault at the preliminary hearing. The trial court ruled:

"We are not going to do a mini trial on a jailhouse fight. I think that it is undue consumption of time. [¶] Certainly there was a significant amount of impeachment on Mr. Bolding as it was and I think the last thing in the world that we should be doing is . . . litigating a fight that occurred a couple of years ago in county jail over food packets, whether, in fact, that even occurred. [¶] . . . [¶] [I]t has minimal probative value and ultimately would end up consuming a fair amount of time which we're not going to do a mini trial on a jailhouse fight."

Defendant contends this ruling was an abuse of discretion. He asserts that the defense theory rested on evidence that Mr. Bolding could not be trusted, and that "consumption of time is irrelevant where, as here, the evidence is not cumulative."

There was plainly no abuse of discretion. For one thing, the evidence *was* cumulative. The defense had already elicited an admission from Mr. Bolding that he lied at the preliminary hearing, albeit on a different subject (and also that he lied earlier at trial, when he testified he had not lied during the preliminary hearing). Although, under continued cross-examination, Mr. Bolding retreated (or tried to do so) from these admissions, the trial court aptly observed that there had already been a significant amount of impeachment of Mr. Bolding. And the record is replete with questioning about Mr. Bolding's statement to the police that his memory was affected by various substances he had smoked since the assault, and his inconsistent testimony at the preliminary hearing and trial about what those substances were. In short, the record demonstrates no error in the court's conclusion that the undue consumption of time far outweighed the "marginal, if any, relevance" of evidence relating to the Smith assault.

4. **The Claim of Instructional Error**

The trial court instructed the jury with CALCRIM No. 226 on the evaluation of a witness's testimony. The instruction includes this factor among others the jury may consider: "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided?"

Defendant contends the trial court erred in denying his request for "a more pinpoint [instruction] concerning a financial motive in the outcome." Counsel argued: "I know personal interest can – is certainly a more general term, but I think there are specific motives that may be relevant in this case given the lawsuit and such." The court stated it was "disinclined to do that, but I'll think about it." Nothing further appears in the record, and the trial court gave the standard instruction.

The applicable rule is that, upon request, "a trial court must give jury instructions 'that "pinpoint[] the theory of the defense," ' but it can refuse instructions that highlight '"specific evidence as such." ' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 886.)

23

We see no error in the instruction as given under the circumstances in this case. So far as the "theory of the defense" is concerned, there is no pertinent distinction between "a personal interest in how the case is decided" and "a financial motive in the outcome." Defendant's complaint that the instruction as given did not explain that the jurors "could take into consideration a witness's financial motive," and "prevented a complete presentation of [defendant's] defense to the jury," is simply not a reasonable view of the instruction.

Moreover, defense counsel clearly explained the financial motive theme in his closing argument. Discussing reasonable inferences pointing to innocence, counsel said: "You think it's unreasonable that Mr. Bolding would be motivated by money in any way? What was his own statement to us? Range Rover. That's money. That's money. [¶] This is a man long before any result in this case has already filed a civil lawsuit against [defendant]. He has an attorney here every day. Do you think this man may be motivated to shift, to color his testimony by money? [¶] He certainly wasn't motivated to stop his criminal conduct of selling crack cocaine. Money motivated him there. . . . [¶] . . . [¶] . . . He certainly wasn't motivated to stop – what did he say? Taking money in the system. It's all good. [¶] Do you think he may be motivated by this civil lawsuit against the only person out of the two who's here? [¶] Do you think that's crazy to think that Mr. Bolding would just make something up after the fact? [¶] Do you think it's crazy to think that anybody's testimony may have been tainted in some way or impacted in some way either by time or by the desire for a result?"

In short, there could be no mistaking the defense's theory that Mr. Bolding should not be believed because he was "motivated . . . to color his testimony by money," and it is equally clear that the instruction given informed the jury that it could consider that fact in determining the witness's credibility. No more was required.

We have found no error, and necessarily reject as well defendant's claim of cumulative error.

24

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.