Filed 10/1/20  P. v. Murdock CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVON MURDOCK,<br><br>        Defendant and Appellant. | B296599<br><br>(Los Angeles County<br>Super. Ct. No. TA139574) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed and remanded with directions.

        Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and William N. Frank, Deputy Attorney General, for Plaintiff and Respondent.

_____

Davon Murdock appeals his convictions for murder and possession of a firearm by a felon.  Murdock started a fistfight with Kenneth Bragg, but Bragg bested him.  Murdock resorted to a pistol:  he fired, missed Bragg, but killed Davon "Day Day" Williams.  We will supplement the facts as needed to analyze each of Murdock's six appellate arguments.  His first four arguments lack merit.  His fifth and sixth contentions concern his sentence and are right.  Unmodified statutory citations are to the Penal Code.

## I

Murdock first claims the court should have instructed the jury on the lesser included crime of manslaughter, which requires evidence of provocation.  Murdock does not contest he started the fight with Bragg.  You cannot start the fight and then claim provocation.  (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

As a matter of law, this rule is sound.  The law does not reward aggressors for aggression.  Murdock does not explain why the law should.  We reject Murdock's first argument.

## II

Murdock's second claim is the judge erred by denying his motion to recall a witness who had finished her trial testimony.  This claim is incorrect.  The judge's decision was a classic exercise of acceptable judicial discretion:  the probative value of Murdock's proffer was speculative, and it threatened to enmesh the trial in tangential controversies.

## A

The witness, S.A., is the central figure in this argument.  Her relationship to this case is factually complex.  It evolved through four stages.  First, police interviewed S.A., who fingered

Murdock as the killer, even as she expressed great fear of him. Second, at trial on direct examination, S.A. changed her story: now she knew nothing. Third, S.A. changed her story again on redirect: now she said a bribe from the victim's family made her implicate Murdock. Fourth, after S.A. left the courthouse, a group converged and a woman attacked her.

This final episode is our focus here.

Murdock moved to recall S.A. to tell the jury about being attacked. The defense told the court S.A.'s testimony would rebut the prosecution's theory that Murdock was intimidating. "If Mr. Murdock was clearly who they say he is, they [S.A.'s attackers] would have been completely afraid to have touched [S.A.] . . . ."

The trial court denied Murdock's motion because it lacked a showing of "sufficient nexus" to be relevant to the proceedings.

Murdock challenges this ruling, which we affirm.

To delve into this issue, we describe the four stages of S.A.'s evolving statements, one step at a time. Then we describe Murdock's motion and the court's ruling. And then we analyze the legalities.

1

Detectives interviewed S.A. on November 16, 2016, almost a year after the shooting. S.A. was afraid of Murdock. She would not testify against him or write anything down; anyone who cooperated with police must have "death wishes right now." She did not "want to be on this case" because snitches would get killed. Murdock was "crazy, and if he [was] making calls from wherever he's at right now for people to get killed, I don't want to be a part of it."

S.A. nevertheless told detectives she saw Murdock shoot Williams. Bragg and Murdock's nephew Malik Frederick were

3

playing dice.  Frederick got angry with Bragg.  Bragg told Frederick to go get some money.  Frederick went to get one of his uncles to fight Bragg.  Murdock heard about the situation and went over to confront Bragg.  S.A. said Murdock was "talkin shit and he pulled out his gun and started shooting."  When Murdock started shooting, S.A. saw Williams "got shot."

2

At trial, police had to force the reluctant S.A. to obey her subpoena and to come to court.  S.A. was hostile throughout her testimony.

S.A.'s version on direct examination was simple:  she did not know anything.

S.A. admitted she was near the scene the night of November 27, 2015, and heard gunshots.  But she did not know what happened.  She did not know who Murdock was.  She saw Williams run to his car, but did not know about any dice game.  She was in the house and did not see anything.  S.A. adamantly insisted she did not know about a fight or anything else.

Further, S.A. testified she was not afraid to testify.  She admitted speaking to a detective on November 16, 2016, but claimed she had not said she was afraid.  She told him she would not get on the stand because this matter had nothing to do with her.

3

During the prosecution's redirect examination, S.A. changed her account yet again.  Now S.A. claimed the victim's family had bribed her to tell police Murdock was the shooter.

Towards the end of the redirect examination, S.A. announced, "I'm just going to tell you the honest truth."  Then she said Williams's uncle paid her to implicate Murdock.  In

4

exchange for S.A.'s statement to detectives on November 16, 2016, identifying Murdock as the shooter, the victim's uncle also paid for a place in Barstow where S.A. and her children could move.

S.A. said she truly did not know what happened the night of the shooting, and had been honest throughout her testimony on direct examination. Everything she told the detectives was "just hearsay" from Williams's family.

### 4

S.A.'s saga took a new turn when she finished her testimony, left court, and was the target of an attack. The defense sought to recall S.A. to testify about the attack. The trial judge denied this request, which is the ruling Murdock now challenges.

#### a

We lay out pertinent details.

##### i

Days after S.A. testified but while the trial was still in progress, S.A. returned to the courthouse at a lunch break to report what had happened to her. A small crowd gathered to hear: lawyers from both sides, detectives, investigators, a paralegal, and a research attorney. This lunchtime session was outside the presence of the jury and was not recorded.

At this session, S.A. said that, after she testified at trial and was away from the courthouse, she had been attacked. Three cars pulled up. Six people got out. A woman from one car injured S.A.'s hand and gave her a black eye.

##### ii

Who were these people in the cars? S.A.'s account was indefinite.

S.A. said some people in the cars had been in court when she testified. Those people had been sitting on *Murdock's* side of the courtroom during the trial.

Another person who arrived in one of the cars was Murdock's nephew Malik Frederick.

We pause here to elaborate Malik Frederick's role in this case. Detectives interviewed Frederick on December 4, 2015. Frederick told detectives he got into an argument with Bragg over a dice game the night of the shooting. Bragg called Frederick a "bitch ass little kid." Frederick told another uncle named Michael about the argument. Murdock overheard the conversation and took off running towards Bragg. Murdock and Bragg started to fight.

At the crime scene and by blood relations, Frederick thus was associated with defendant Murdock, not with victim Williams and his family.

At this point in the hearing, however, defense counsel stated "it was unbeknownst to me to the extent Malik has family members on the Davon Williams side, I believe from his father, and he has family members from the mother on the Murdock side, he [Malik] was present during the beat down."

S.A. continued to describe what had happened to her. Williams's sister was "on the scene as well." This sister is named Carla. S.A. did not say Carla arrived with the people in the cars or that Carla was involved in the beating. Rather, after the beating, Carla told S.A. Carla had seen S.A. involved in a fight "with this one other girl." Carla asked S.A., " [H]ey, what happened over there? What's going on?' "

b

After this conference with S.A., the defense and prosecution lawyers went to court, where they went on the record.  S.A. did not attend this court hearing.

The defense started speaking first, recounting the thrust of S.A.'s words in the form of a cooperative factual account.  That is, before beginning her account, the defense attorney asked a police detective to correct her if she made a mistake.  The detective said, "Sure."  To a degree, then, the defense and the prosecution agreed on what S.A. had just said.  The two sides disagreed, however, about what, if anything, to do about it.  The defense and the prosecution gave the trial judge somewhat differing interpretations of S.A.'s statements.

According to defense counsel, S.A. "knew it was [Williams's] people" who attacked her because they were upset "that she flipped the script" at trial, presumably by testifying that a bribe made her lie to police about Murdock.  Defense counsel also stated, "The issue that she indicated to me that these people were having with her was, one, that she went—that she gave them an address in Barstow [when she testified at trial].  ¶  We know she didn't give them an address in Barstow.  She just acknowledged that she was in Barstow."

According to the prosecution, however, the only reason S.A. gave for the attack was "because of the address in Barstow."  The prosecution pointed out S.A. did not testify about an address in Barstow.  The defense had agreed on this score:  "We know she didn't give them an address in Barstow."

Defense counsel agreed she did not ask S.A. about a purported payment from Williams's uncle in exchange for lying to the police during this lunchtime session when S.A. described the

7

attack.  Thus it was unclear what defense counsel meant when she said S.A. "knew it was [Williams's] people" who attacked her because they were upset "that she flipped the script" at trial.

We quote the key part of defense counsel's proffer.  The italics are ours.

> Defense Counsel:  We asked her—my concern was was she—was she beat down?  Who beat her down?  And how does she know these people?  And how does she know [whose] side they are on?  That was the concentration of this particular meeting.
>
> And yes, I would like to bring her on for a number of reasons.
>
> The Court:  Let's hear them because so far the court is not persuaded to allow her to testify.  But I'll listen.
>
> Defense Counsel:  Thank you, Your Honor.  First of all, this is a witness that clearly we knew—my gut feeling was something was wrong.  She wasn't giving up information to either the district attorney or myself to a certain extent.
>
> She was on the stand for approximately two hours before she indicated that I'm just going to tell you the truth that I was paid whatever.
>
> And if the court noticed, if you noticed her demeanor at that time, she was very rigid with all of us, but her demeanor calmed down a little bit once she indicated that she had, in fact, been paid.
>
> Now, the importance of her being beat down in this particular case, the district attorney's case is focused solely—focused [mainly] on the fear of these

particular witnesses. Everybody is in fear. Everybody.

They have these tapes where even though the witness will say they are not in fear, but they are attempting to persuade the judge everything is fear. Everything is fear. Everything is fear because of who my client's reputation is—of who my client or what my client's reputation is.

For a witness, who *at the conclusion of her testimony, said something that* I, from a defense perspective, *was very positive for the defense* and that she was there subsequently after beat down, not by my client, but by the victim's circle, you know, of friends, goes right to the issue that the district attorney is attempting to prove this fear.

*If Mr. Murdock was clearly who they say he is, they would have been completely afraid to have touched this girl* who in the end result gave testimony was somewhat—

The Court: I don't follow that part of it but—

Defense Counsel: And the fact that—that there's been all this conversation on fear, and then we get to the end of the day—the detective said numerous times has Murdock tried to reach out to you? Has anybody tried to harm you? Has anybody? They have gotten a negative response to all of that.

And then at the end of the day we get someone who is beat down. Not by my client or his people. We get somebody who is beaten down by their side. *Which, one, justifies and clarifies the fact that she*

*was, in fact, potentially telling the truth on that particular issue because she was beat down.*

>And I—I don't know what—if she were to take the stand—and I know in speaking to the district attorney, I know we can't clear this court, I'm not sure what she'd say if she has to look at the individual who was present, which I'm talking about the sister who sits in court, if she had to look at the sister who was present and described this who we know she was at the scene. So it's problematic.

>But I think it's extremely—this is a life case for my client. And I think that it is extremely relevant information. And I think a jury should have a right to hear this information.

The prosecution responded that S.A. had not been clear about whether the attackers were from Murdock's side or from Williams's side, because, among other things, "[t]he people who [S.A.] said came out of the cars were all sitting on Murdock's side [of the courtroom] engaging with Murdock's family members."

Defense counsel said those individuals were not with Murdock's family. Counsel asked if the court recalled a group of people causing "a little ruckus" in the courtroom, and said Murdock's family told her "these people are not with them." The trial court noted they were sitting with Murdock's family members and interacting with them. The court stated the interactions "were not mean spirited or anything."

The trial court denied the defense motion to recall S.A., stating, "There's not been sufficient nexus for this court to put her on that leads this court to believe that it would be relevant for these proceedings." After further discussions with counsel,

10

the court maintained defense counsel's offer of proof, "on its face, was insufficient for the court to find that it was of evidentiary value for this jury" and stated "the court is not going to open this up to another trial."

c

In a motion for a new trial, Murdock's new defense counsel argued the trial court improperly excluded S.A.'s testimony the victim's family beat her up. Counsel argued this testimony was relevant to S.A.'s credibility and the truthfulness of her statement to the police that she saw Murdock shoot Williams.

At the new trial motion hearing, defense counsel argued the testimony "was rehabilitative evidence for the defense" of S.A.'s credibility. She argued the jury should have heard S.A. was "beat down" after testifying that Williams's uncle paid and relocated her "because witnesses' credibility was being impeached all over the place, including [S.A.'s]," and the evidence would have bolstered S.A.'s credibility.

The trial court denied the new trial motion. The court stated: "The attitude and the—basically, the credibility of [the] witnesses was determined by this jury, by way of the function of returning a verdict. ¶ As to [S.A.'s] beat down, this was litigated. There has been nothing that's been put forward to this court that makes me believe that the court made any error at all in not allowing that testimony."

B

We review this issue for abuse of discretion. (*People v. Thomas* (1992) 2 Cal.4th 489, 542.) The trial court may, in its discretion, recall a witness who has been excused from giving further testimony in the case. (Evid. Code, § 778.)

11

The court's exercise of discretion was sound. (See *People v. Roberts* (2010) 184 Cal.App.4th 1149, 1192.) The probative value of S.A.'s proffered evidence was low. The potential for an undue consumption of time and confusion of the issues substantially outweighed this low probative value. (See Evid. Code, § 352.)

1

The probative value was low because the evidence was ambiguous and the inferences to be drawn from it were speculative.

The evidence was flawed in three ways: the identity was speculative, the motive was doubtful, and the relevance was tenuous.

a

First, the identity of the people who attacked S.A. was ambiguous. S.A. thought her attackers were affiliated with the victim's camp, but there also seemed to be links with Murdock's camp as well. Murdock's nephew Malik Frederick was in one car. Murdock's lawyer never tried to explain or make sense of that, except to say Frederick had family members on both sides. And the trial judge apparently had seen some unnamed court attendees who were at the beating in the courtroom during trial, where the judge had observed them speaking with Murdock's camp. The trial judge had watched those interactions, which were "not mean spirited or anything."

Most puzzling was the basis for S.A.'s apparent speculation her attackers were from the victim's camp. When asked why she thought that, S.A. had paused: she did not have a ready answer. When she did answer, S.A. said it was because Williams's sister Carla had asked S.A. " 'what happened.' " Carla asked this after the beating was over. Carla apparently had not arrived in one of

12

the three converging cars, nor had Carla apparently taken any role in the beating.  Carla's question " 'what happened' " did not logically support S.A.'s conclusion the attackers were connected with the victim's family.  Absent a logical foundation, S.A.'s thinking was unsupported and possibly irrational speculation.

b

Second, the motive for the attack remained doubtful.  Was it because S.A. had revealed an address in Barstow?  That is what S.A. said.  But everyone else agreed S.A. had not named some address in Barstow during her testimony.  And why would revealing an address in Barstow prompt an attack?

S.A. did claim on redirect that Williams's uncle had moved her to someplace in Barstow as part of the supposed bribe, but the inference to be drawn from that fact was unclear.  Was the attack supposedly a reprisal because S.A. told the *truth* and divulged a corrupt bribe in open court, thus prompting the bribers to punish her disclosure?  Or was the supposed reprisal because S.A. told a *lie* and had besmirched a grieving family with a false bribery claim, thus triggering righteous outrage in the victim's family?

These competing explanations had opposite implications for the case:  the former would help Murdock, but the latter would hurt him.  Murdock never acknowledged these competing interpretations or explained why one was more likely that the other.

c

Third, the relevance of this testimony to the trial was tenuous at best.  The defense claimed the prosecution was arguing Murdock was an intimidating person, and S.A.'s new testimony would tend to rebut that claim.

13

This defense theory of relevance was weak.

The premise of an attack on S.A. does little to support the conclusion Murdock was not frightening to S.A. and other fearful witnesses. The woman who attacked S.A. remained unknown. It is speculative to ascribe a clear motivation to an anonymous person who acts for unclear reasons.

In sum, these three reasons made S.A.'s testimony ambiguous. The trial court defensibly concluded the defense had not shown a sufficient nexus between its proffer and the trial issues.

2

S.A.'s testimony also had the potential to consume substantial trial time and to confuse the issues. Murdock basically proposed to try a new assault case in the middle of the ongoing murder trial. The assault case was complex. The assault case would involve many actors, nearly all of whom were as yet unnamed and unknown. The claimed motive for the assault was unclear and factually intricate. The trial court fairly could forecast the need for investigative delays and for many additional witnesses.

The trial court judged the delay and complexity of this involved digression outweighed its doubtful value. This exercise of discretion was reasonable. (See *People v. Lee* (2015) 242 Cal.App.4th 161, 181–182.)

C

Murdock argues the trial court's ruling violated his federal right to confrontation. This argument fails.

The Sixth Amendment to the federal Constitution provides a defendant the right to engage in appropriate witness cross-examination, but the trial court retains the ability to impose

14

reasonable limits if counsel's inquiry is repetitive or marginally relevant.  (*People v. Williams* (2016) 1 Cal.5th 1166, 1192.) Routine application of state evidence law does not implicate a criminal defendant's federal constitutional rights.  (*People v. Jones* (2013) 57 Cal.4th 899, 957.)  Specifically, notwithstanding the confrontation clause, a trial court may restrict cross-examination under Evidence Code section 352.  (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.)  Excluding evidence of marginal impeachment value that would require undue time consumption generally does not violate a defendant's constitutional rights to cross-examination and confrontation. (*People v. Pearson* (2013) 56 Cal.4th 393, 455.)  There is no confrontation clause violation unless a reasonable jury might have gotten a significantly different impression of the witness's credibility had the trial court allowed the cross-examination. (*Williams*, *supra*, at p. 1192.)

Cross-examining S.A. about the beating would not have created a significantly different impression of her credibility.  The jury already had spent considerable time listening to S.A.  It had an ample basis for evaluating her credibility and potential biases. In particular, S.A.'s final performance on redirect was, as Murdock's counsel phrased it, "very positive for the defense . . . ."

When S.A. left the witness box, it was on a high note for Murdock.  Bringing S.A. back to relate a complicated story with an uncertain meaning would have been risky business for Murdock and a detour for the jury.  The trial court's exclusion of this evidence was proper and did not violate the confrontation clause.  (See *People v. Brown* (2003) 31 Cal.4th 518, 545.)

Murdock invokes *Olden v. Kentucky* (1988) 488 U.S. 227 (*Olden*), a case far afield from this one.

15

*Olden* was a race case. Defendant Olden was an African-American man charged with sexual assault against a white woman. (*Olden*, *supra*, 488 U.S. at p. 228.) Olden maintained their sexual encounter was consensual and the woman cried rape only when her African-American lover, who was a man named Russell, saw her alight from Olden's car at the end of their encounter. Olden's theory was the woman hoped to prevent Russell from suspecting her of infidelity. To support this theory, Olden sought to cross-examine the woman about her romantic relationship with Russell, with whom she was living by the time of trial. The trial court excluded this evidence. The intermediate appellate court affirmed, writing that " 'there were the undisputed facts of race; [the woman] was white and Russell was black. For the trial court to have admitted into evidence testimony that [the woman] and Russell were living together at the time of the trial may have created extreme prejudice against [the woman].' " (*Id.* at pp. 229–231.)

The Supreme Court summarily reversed. The evidence Olden hoped to elicit was crucial to his case. (*Olden*, *supra*, 488 U.S. at p. 233.) The trial court's exclusion of this evidence "was beyond reason. Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the woman's] testimony." (*Id.* at p. 232.)

This case is worlds away from *Olden*. The trial court did not speculate as to the jurors' racial biases. Rather, it excluded a time-consuming and confusing presentation of evidence that would have had little probative value. *Olden* is not pertinent to this case.

Murdock cites *United States v. Manske* (7th Cir. 1999) 186 F.3d 770, 777–779 (*Manske*), which has no application here. The issue in *Manske* was whether a party could ask witnesses about their bias. *Manske* said yes. But Murdock did not want to ask S.A. about her bias. He wanted to recall her so she could testify about the attack, claiming this would show Murdock was not intimidating. Murdock's proffer did not claim a witness was biased. Rather, it urged a character conclusion about a non-witness: Murdock. Nor did this trial court's analysis under Evidence Code section 352 have any parallel in *Manske*. The federal counterpart to section 352 is rule 403 of the Federal Rules of Evidence (28 U.S.C.). The *Manske* decision does not cite rule 403. *Manske* is irrelevant.

The trial court did not violate Murdock's federal constitutional rights.

### III

Murdock's third claim is the court erred by denying his motion for a new trial, which Murdock based on his claim of newly discovered evidence, among other grounds.

We review this ruling for an abuse of discretion. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1047.)

The basis for Murdock's claim of new evidence was a declaration from one Adon Howard, whose declaration stated Murdock was "definitely not the shooter."

This evidence did not warrant a new trial because Murdock made no showing the evidence was new. (See *People v. Dyer* (1988) 45 Cal.3d 26, 52 [generally evidence must be newly discovered to warrant a new trial] (*Dyer*).)

Murdock was aware of Howard's status as a witness from before the victim was murdered. By Howard's account, Howard

17

was at the scene of the shooting and alongside Murdock from start to finish.

Howard's declaration described events this way. Before the shooting, Howard was with "one of my boys, Davon Murdock." When a fight started, Howard "sprang to action" to brawl alongside Murdock. Howard heard shooting. Then Murdock, Howard, and another person named Backdoor "were recovering from the brawl." They asked each other questions: who was shooting? Are you ok? Then Howard fled "in the same direction as Murdock until no one else was in view."

Murdock presented no evidence about *when* the defense contacted Howard. Neither did he offer evidence *why* Howard did not testify at the first trial.

Absent evidence, a presumption of regularity prevails. In other words, the party moving for a new trial faces a burden of presenting evidence as to why a second trial is necessary. We do not presume the contrary: that there is a right to a second trial unless the opposing party disproves the right. That approach would be contrary to customary practice and common sense.

The presumption of regularity would suggest the defense knew about Howard from Murdock, who knew about Howard from the start. The same presumption suggests the defense decided for tactical reasons it would not be helpful to Murdock to call Howard as a witness. There is no evidence to the contrary.

The trial court rightly denied Murdock's new trial motion in this situation. (*Dyer, supra,* 45 Cal.3d at p. 52.)

For his new trial motion, Murdock's lawyer was different from his trial lawyer. Without evidentiary support, the new lawyer told the trial judge "Howard was hard for us to obtain" and that even after counsel made contact "he was equally difficult

18

and didn't want to get involved."  Counsel used the words "us" and "we" in describing contact with Howard, but it was unclear when the defense "got ahold of him" and whether these pronouns referred to Murdock's trial lawyer or his new lawyer or both.  The trial court was entitled to discount these lawyer's comments as unfounded in evidence.

Murdock argues the court was wrong to deny the new trial motion because Howard's evidence, as believed, would be powerfully exculpatory.  Murdock cites *People v. Martinez* (1984) 36 Cal.3d 816.  In the *Martinez* case, however, the witness with the newly discovered information testified he had not come forward earlier because he had not realized his information was vital until after the defendant's conviction.  (*Id*. at p. 821.)  The witness himself thus explained his evidence indeed was new.  The witness also gave a cogent reason for the delay.  (*Ibid*.; see also *People v. Soojian* (2010) 190 Cal.App.4th 491, 502, 513 [only during trial did evidence emerge about an alternate suspect].)  This case is different.  Neither Howard nor anyone else here supplied evidence of that kind.

### IV

Murdock's fourth claim is cumulative error.  He argues the cumulative effect of the claimed errors rendered his trial unfair.  But there were no errors.

### V

Murdock's remaining claims are about his sentence.  The trial court sentenced Murdock to a total of 51 years to life:  a term of 25 years to life for first degree murder (§ 187, subd. (a)), a consecutive term of 25 years to life for a firearm enhancement (§ 12022.53, subd. (d)), and a one-year term for a prison prior (§ 667.5, subd. (b)).  The court also imposed a concurrent term of

three years for the gun possession conviction (§ 29800, subd. (a)(1)).

Murdock's fifth claim is the trial court erred by imposing a concurrent term of three years for the firearm possession conviction. This argument is correct: the trial court should have stayed this sentence under section 654 because there was no evidence Murdock possessed the gun before the moment he shot and killed Williams.

Section 654 prohibits multiple punishments for a single act or course of conduct. (*People v. Ramirez* (2006) 39 Cal.4th 398, 478.) Whether an offense is an indivisible course of conduct is a question of fact. We uphold the trial court's ruling when substantial evidence supports it. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

With respect to punishment for possessing a firearm as a felon, the conduct is divisible and additional punishment is proper so long as Murdock purposefully possessed the gun before the murder took place. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1144.)

There was no evidence Murdock possessed the gun before he started to fight Bragg. The People argue S.A.'s statement that she saw Murdock pull a handgun from his waist and fire it "was sufficient to support the inference that [Murdock's] possession of the firearm was antecedent to and separate from the primary offense of shooting and killing Williams . . . ." The People cite the transcript of S.A.'s statement to the police. In this statement, S.A. was clear she did not know the source of the gun.

With our italics, we quote the excerpts showing S.A. did not know where Murdock got the gun.

20

Witness: And Murdock pulled out the gun and started shooting and then [Williams] got shot twice.

Officer: Could you tell where he pulled it out from?

Witness: From his waist; where else he goin to pull a gun?

Officer: Did you see it in his waist or could you tell where he put it?

Witness: *I don't know where he pulled it from.* I just seen it in his hand and I seen him start shooting, and I just ran . . . ."

S.A. reiterated she couldn't see from where Murdock pulled the gun, and said there were several people standing next to him. When asked if she could "tell if somebody passed him a gun," she responded, "I'm not even sure. I'm not goin to lie to you. I'm not even sure because everything happened so fast, you know?" She later repeated, "So I'm not even sure. I don't know if he pulled it out, somebody passed it to him. Like, I'm not even sure. I just seen him shooting."

S.A. thus did not say she saw Murdock pull a handgun from his waist. She assumed it was in his waistband. But when pressed, she emphasized she did not know how he got the gun; she just saw him shooting. This evidence does not support the prosecution's argument that Murdock possessed the gun before shooting Williams.

The People also cite a page of S.A.'s trial testimony and a page of a detective's testimony about S.A.'s police statement, but neither are relevant here. S.A. testified she did not know anyone by the name of Davon Murdock and did not see anyone shoot anyone else that night. The detective testified S.A. told him ". . . Murdock ran and started shooting at [Bragg]—or started

21

shooting." These statements do not imply Murdock already had the gun before shooting.

The People cite no other evidence that Murdock had the gun before the shooting. Substantial evidence did not support additional punishment for Murdock's firearm possession conviction. The trial court must stay execution of this sentence. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)

## VI

Murdock's sixth argument is we should strike his one-year sentence for a prison prior, and the prosecution agrees.

The parties note Senate Bill No. 136 (2019–2020 Reg. Sess.) (SB 136) amended section 667.5 to eliminate sentences for certain prison priors. SB 136 became effective January 1, 2020. Under this new legislation, the one-year prison term enhancement under section 667.5 now applies only to prior prison terms served for sexually violent offenses. (§ 667.5, subd. (b).)

The parties correctly agree SB 136 applies retroactively to Murdock's sentence because his prior conviction was not for a sexually violent offense and his judgment was not final when the bill became effective. (See *In re Estrada* (1965) 63 Cal.2d 740, 745.)

We strike the one-year sentence for the prison prior in light of SB 136. The People argue we should remand the matter for resentencing on this issue, "because the trial court imposed less than the maximum sentence available" by imposing a concurrent term of three years for the firearm possession conviction when it could have imposed a consecutive term. However, because we order the trial court to stay the firearm possession sentence under section 654, there is no greater prison term for the trial court to consider. As the People note, "[t]he trial court was

22

required to sentence [Murdock] to state prison for the indeterminate term of 25 years to life for the first degree murder pursuant to section 190, subdivision (a), plus a consecutive indeterminate sentence of 25 years to life pursuant to section 12022.53, subdivision (d)."

We thus need not remand the case to the trial court on this issue, because the trial court has no sentencing discretion to exercise.  (Cf. *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)

## DISPOSITION

The one-year sentence for the prison prior is stricken from Murdock's sentence, so his total sentence is 50 years rather than 51 years.  The case is remanded for the trial court to stay the sentence for possession of a firearm by a felon.  We direct the trial court to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment. The judgment is otherwise affirmed.


WILEY, J.


We concur:



BIGELOW, P. J.




STRATTON, J.




23