Filed 6/12/24  P. v. Mora CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

CHRISTIAN L. NIETO MORA,

    Defendant and Appellant.

E081352 & E081353

(Super.Ct.Nos. FWV19002483
 & 16CR038681)

OPINION

    Appeal from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed.

    Laura R. Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

    Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, Kristen Chenelia, and Matthew C. Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

1

Christian Leonardo Nieto Mora (Nieto) is a Colombian citizen who entered the United States on a tourist visa in 2013. He has not left the United States since then. In 2016, he pled no contest to grand theft. (Pen. Code, § 487, subd. (a); unlabeled statutory citations are to this code.) In 2019, he pled no contest to opening or maintaining a place for unlawfully selling a controlled substance. (Health & Saf. Code, § 11366.) Nieto moved to vacate the 2016 and 2019 convictions under section 1473.7, subdivision (a)(1), and the trial court denied both motions. We affirm.

BACKGROUND

I.    *Nieto's 2016 conviction for grand theft*

The People filed a complaint in August 2016 charging Nieto with grand theft of personal property. (§ 487, subd. (a).) Isaac Vega represented Nieto in the case.

According to the police report, Nieto forged a driver's license, title to a Porsche, and a bill of sale for the Porsche, and he then listed the Porsche on eBay for sale. He found a Porsche for sale on another website and used the images and videos on that site to create his eBay listing. The victim responded to Nieto's listing and transferred $42,500 to Nieto's accounts, and after she tried for several days to pick up the car, Nieto blocked her phone calls and emails. When officers searched Nieto's home, they found evidence of other forged driver's licenses, titles to cars, and bills of sale, including forged documents relating to a Ferrari, a Bugatti, and a Lamborghini.

In November 2016, Nieto pled no contest to the single count of grand theft. The parties stipulated that the police report provided a factual basis for the plea. At the plea hearing, the court asked Vega whether he had explained to Nieto "all immigration

2

consequences that might apply." Vega responded that he had done so with the assistance of the Spanish language interpreter. On Nieto's signed plea form, Nieto initialed the box next to the following advisement: "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization will result from a conviction of the offense(s) to which I plead guilty/no contest." Nieto also initialed the box next to an advisement stating that his attorney had "explained . . . other possible consequences of this plea." That advisement was followed by a list of consequences, and the form directed the user to "[c]ircle possible consequences." The list of possible consequences included an "[o]ther" category, followed by a blank line. None of the consequences was circled, but someone had handwritten "Possible immigration consequences" on the blank line next to "[o]ther."

The court suspended imposition of sentence, placed Nieto on probation for three years, and ordered him to serve 90 days in county jail as a condition of probation. The court specified that he was eligible to serve the jail time through the work release program. In addition, the court ordered him to pay $42,847.24 in restitution to the victim of the theft offense.

II.     *Nieto's 2019 controlled substance conviction*

The People filed a felony complaint in August 2019 charging Nieto with four offenses: possession for sale of a controlled substance (MDMA);[1] forgery or counterfeiting of seals; possession of a forged driver's license or identification card; and

---

[1]     MDMA stands for methylenedioxymethamphetamine, "colloquially known as 'Ecstasy.'" (*People v. Patterson* (2017) 2 Cal.5th 885, 889, fn. 1.)

making, possessing, or trafficking in incomplete access cards or cardmaking equipment. (Health & Saf. Code, § 11378; Pen. Code, §§ 470b, 472, 484i, subd. (c).) The People also filed a petition to revoke Nieto's probation in the 2016 case. Christopher Koch represented Nieto in 2019.

According to the police report, officers conducted a probation search of Nieto's home and found 94 pills that appeared to be MDMA. Officers field tested several of the pills, and they were positive for MDMA. Ninety of the pills were packaged in 10-pill increments. The officers also found hundreds of Viagra pills, $15,550 in cash, 84 unused baggies that were identical to the packaging for the MDMA pills, a forged identification card, a credit card reader/writer, and dozens of blank cards with write capabilities and embedded security chips. Nieto's wife told the officers that she liked to take MDMA and that the pills belonged to her. She said that there were roughly 50 pills and described them as pink and red without markings. But 40 of the pills were purple, 54 of them were pink, and all of them had markings. Some were embossed with "AUDI" on one side and the Audi symbol on the other side. Others had a skull on one side and the letters "PP" on the other side. And a third group were embossed with "EA SPORTS" on one side and an asterisk on the other.

When the officers interviewed Nieto, he accurately described the color of the pills and knew that they were marked with "Audi and Skeletons." He said that he used the forged identification card to play in a 35-plus soccer league. (He was only 33 years old.) In addition, he said that he used the credit card reader/writer to make identification cards for his soccer league.

4

At the plea hearing in September 2019, the People moved to add a fifth count to the complaint—opening or maintaining a place for unlawfully selling a controlled substance. (Health & Saf. Code, § 11366.) Nieto pled no contest to that offense and possession of a forged driver's license or identification card, and the court dismissed the remaining counts. (§ 470b.) The parties stipulated that the police report provided a factual basis for the plea. On Nieto's signed plea form, Nieto initialed the box next to the following advisement: "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, and denial of naturalization may, and for certain offenses will, result from a conviction of the offense(s) to which I plead guilty/no contest." The court suspended imposition of sentence, placed Nieto on probation for three years, and ordered him to serve 270 days in county jail as a condition of probation. As part of the plea agreement, Nieto agreed to forfeit the cash found during the search of his home to the victim of his 2016 theft offense. With respect to the 2016 case, Nieto admitted the probation violation, and the court revoked and reinstated his probation.

III.    *Motions to vacate the convictions*

Nieto filed a motion to vacate his 2016 conviction and a separate motion to vacate his 2019 conviction for the controlled substance offense. In both cases, he argued that under section 1473.7, he did not meaningfully understand the immigration consequences of his pleas, and he would have rejected the pleas if he had understood the consequences.

Nieto submitted declarations in support of the motions.[2]  The declarations stated that he was from Colombia and had fled the country after persecution by a paramilitary group, the Revolutionary Armed Forces of Colombia.  Members of the group had violently beaten him, dispossessed his family of land, extorted him and his family, and threatened their lives.  He said that his "priority has always been" remaining in the United States because he will be killed in Colombia.

With respect to the 2016 grand theft offense, Nieto stated that he retained Koch, and Koch knew that his top priority was immigration.  Koch told him that Koch would negotiate an agreement that would keep Nieto out of jail so that he would not have problems with immigration.  But Koch sent Vega to represent Nieto at the plea hearing.  Vega did not mention anything about the immigration consequences of Nieto's plea.  Vega merely said that he had negotiated a good plea deal and that Nieto would not serve one day in jail.  Instead, Nieto would get 90 days of community service and probation.  Vega pushed Nieto to sign the plea agreement right away, and he did not explain what the agreement said.  The agreement was in English, and Nieto did not have an interpreter.  Nieto stated that he would not have accepted the plea deal if he had known about the immigration consequences; he would have fought his case and gone to trial.

---

[2]    Nieto's unsworn declarations did not contain any certification that the facts stated in them were "true under penalty of perjury."  (Code Civ. Proc., § 2015.5; *People v. Pierce* (1967) 66 Cal.2d 53, 59.)  The People objected on that basis to the admission of the declarations, but the court overruled the objection, reasoning that the objection went to the weight of the evidence, not its admissibility.

With respect to the 2019 controlled substance offense, Nieto again retained Koch. Nieto said that he asked Koch whether "something could happen to [him] with immigration." Koch replied that he would call his friend, who was an immigration lawyer. After the call, Koch told Nieto that he was going to ask the prosecutor to change the offense to maintaining a house where drugs were used, instead of possession for sale. The prosecutor agreed to that alternative charge. Koch advised Nieto that "in the eyes of immigration," that offense was better, so Nieto agreed to it. Koch also told him that the plea deal was very good, it would not affect his immigration case, and it was immigration safe. Koch pressured him to sign the plea agreement quickly and advised him that if he did not accept the offer, then he would face three years in prison. Koch told Nieto where to sign and initial on the agreement, but no one explained what Nieto was signing.

Nieto stated that the federal government was now trying to deport him, and Immigration and Customs Enforcement (ICE) had detained him for over six months. He also said that he would not have taken the plea deal if he had known about the immigration consequences; he would have fought for an immigration safe plea or taken his case to trial. When ICE detained him, he was working a good job, coaching his children's soccer team, taking care of his family, and living in a nice home.

Besides his declarations, Nieto also submitted evidence of his tax returns for 2016 to 2019; his marriage certificate showing that he and his wife were married in San Bernardino County in 2020; one daughter's birth certificate showing that she was born in 2017 in Los Angeles County; birth certificates for his two other daughters showing that one was born in 2007 and the other was born in 2008, both in Colombia; medical records

7

for one daughter showing that she was hospitalized after attempting suicide in March 2019; a 2016 agreement for him to serve as an independent contractor for a digital entertainment company; a 2022 statement of information for a California corporation identifying Nieto and his wife as the officers and directors of the corporation; a 2021 grant deed transferring real property in Palmdale to Nieto and his wife; a 2023 mortgage statement for that same property identifying Nieto as the borrower; and character reference letters from five friends and two of his daughters.[3]

Nieto's motion exhibits also included a January 2020 notice to appear in his immigration case. The notice alleged that he is a native and citizen of Colombia, he is not a citizen of the United States, he was admitted to the United States in June 2013 with authorization to remain for 180 days, he remained in the country without authorization after that period had expired, and he therefore was removable.

IV.    *Hearing on the motions*

The trial court held an evidentiary hearing on both motions to vacate the convictions in March 2023. Nieto, Vega, and Koch testified at the hearing. Just before Nieto testified, he moved to exclude Vega and Koch from the courtroom. The court denied the motion. It observed that "certainly the Court has authority to exclude witnesses under Evidence Code section 777, but the purpose of excluding witnesses is to prevent tailored testimony and to aid in the detection of less-than-candid testimony." The

---

[3]    The birth certificate for Nieto's oldest daughter identifies someone other than Nieto as her father. The child's letter indicates that although Nieto is not her biological parent, she considers him to be her father.

8

court reasoned that there was not "any significant risk of [Vega and Koch] tailoring their testimony in a way that would be less than candid merely being present at the testimony of" Nieto.

A. *Nieto's testimony*

Nieto is a Colombian citizen. He entered the United States in June 2013 on a tourist visa and had not left the United States since then. Two of his children were born in Colombia, and the third was born in 2017. Their mother also is Colombian. Nieto's parents and siblings live in Colombia, and he has extended family there as well. At the time of his 2016 plea, Nieto was living with his partner, had children and a job, and had a place to live. He was not willing to give up all of that to return to Colombia, and he had no plans to return to Colombia. His immigration status was important to him.

Nieto hired Koch to represent him in the grand theft case. He never talked to Koch about his immigration status. Koch sent Vega to represent Nieto at the plea hearing. Nieto asked Vega whether the plea deal had any immigration consequences, and Vega said that if the agreement did not include any jail time, then there would be no immigration consequences. Nieto believed that the 90-day sentence for his grand theft offense was community service, not jail time. Nieto had an interpreter at his plea hearing; he had erred by stating in his declaration that he did not have an interpreter.

Nieto again hired Koch to represent him in the 2019 case. The prosecutor's initial offer was a plea to possession for sale of a controlled substance and forgery. Nieto asked Koch if those convictions would have immigration consequences, and Koch replied that he was going to call a friend who was an immigration attorney. Koch returned a little

over an hour later and said that he was going to ask the prosecutor to change the offense to "maintaining a place for drugs," which would be better for immigration purposes. The prosecutor agreed to that alternative offense, and Nieto pled to it.

Nieto's immigration attorney has since advised him that his 2019 conviction is "terrible for immigration." If he had known that at the time, then he would not have accepted the plea deal and would have fought the case. He initialed the boxes on the plea forms stating that there will or may be immigration consequences because he was following his counsel's advice. The "most important thing to" him in both cases was his immigration status.

Nieto was applying for a U visa because his daughter was a rape victim. (See *Medina Tovar v. Zuchowski* (9th Cir. 2020) 982 F.3d 631, 633, 636 [noting that a U visa "is designed to grant legal status to certain non-citizen victims of crime who assist law enforcement," and certain qualifying relatives of the victim may be eligible for a derivative U visa].) He believed that his application would be denied because of his convictions.

Nieto applied for asylum in February 2020 because he feared that he would be killed if he returned to Colombia. He was supposed to file the asylum application within one year of entering the country but did not do so; he did not want to remember everything that had happened to him in Colombia. He had moved for an exception to the one-year rule.

B.    *Vega's testimony*

Vega was licensed to practice law in June 2014.  He focused primarily on immigration law for the first few years of his practice but also did some criminal defense work.

Vega had checked with Koch's firm to see whether it still had Nieto's client file from 2016, and there was none.  But Vega remembered Nieto's case.  The case was clear in his mind because of the sophistication involved.  Nieto displayed "savvy" by creating false advertisements selling high-end, luxury vehicles like Ferraris, Porsches, and a Bugatti.  Vega had not encountered another case with that level of sophistication, so the case stood out to him.

Vega appeared in court four times with Nieto—the arraignment, two settlement conferences, and the plea hearing.  He also met with Nieto outside of court.  Vega did not think that trial was a viable option in Nieto's case, and he discussed that opinion with Nieto.  Vega was concerned about other charges that could have been brought against Nieto, such as wire fraud, which carried a 20-year federal prison sentence.  The officers had also found paperwork for numerous other falsified vehicle advertisements during their search, so other charges for attempt or forged government seals were a risk if the case proceeded.  In addition, the court had set Nieto's bail at $100,000, and Vega anticipated that the prosecution was not going to be lenient.  Nieto had admitted to the charged conduct after officers had advised him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436.

11

Vega discussed immigration consequences with Nieto. Vega was aware that Nieto was a noncitizen and was not a legal permanent resident, so part of his analysis was to research any potential immigration consequences. His practice was to look at a quick reference guide prepared by the Immigrant Legal Resource Center (ILRC), and he reviewed the portion of that guide relating to theft offenses before meeting with Nieto. The ILRC guide stated that grand theft was considered a crime involving moral turpitude. A person convicted of a crime involving moral turpitude within five years of entering the United States becomes removable or deportable and inadmissible.

Vega told Nieto that he was "out of status" and "removable as is," and a grand theft conviction under section 487 would make him deportable and inadmissible. He gave Nieto specific and very detailed advice about the immigration consequences. Nieto's response "was akin to 'I'll take care of that when it happens,'" or "'I'll take care of that if and when it happens.'" Vega again told him that he was going to be removable and inadmissible. Vega never told Nieto that there would be no immigration consequences if he avoided jail time.

Vega sought a continuance in the case and asked Nieto to think "long and hard" about how he wanted to proceed, in light of both the criminal and immigration consequences of the case. He believed Nieto "was in a particularly bad situation." Vega did not think that an immigration-neutral plea like burglary was an option. The facts would not have supported a burglary plea. Vega did not discuss with the prosecutor whether receiving stolen property was an option for the plea deal.

12

By the next court date, the prosecutor had offered probation and some work release. Vega told Nieto that he did not have to take the offer and that they could take the case to trial, but Nieto said that he wanted to plead. Vega reviewed the plea form with Nieto and with the assistance of a Spanish-language interpreter. Vega went over each item on the form, including the standard advisement about immigration consequences and the section about other possible consequences of the plea. He handwrote "Possible immigration consequences" in that latter section. He did not write what he told Nieto about the specific immigration consequences because he did not want to disclose Nieto's immigration status.

C.      *Koch's testimony*

Koch was admitted to the bar in 2000 or 2001. He primarily practices criminal defense. When Koch represented Nieto in 2019, he was focused on two things—keeping Nieto out of prison and getting rid of the possession for sale charge. He had searched for Nieto's client file from 2019, but he could not find it.

Nieto's wife insisted that the MDMA found during the probation search belonged to her, and Nieto corroborated that. Koch thought that the evidence suggested otherwise, but he nevertheless pushed that narrative with the prosecutor and worked hard to eliminate the possession for sale charge. The prosecutor did not buy the claim that the MDMA was for personal use, given the amount of the drug.

Koch did not want the case to proceed to a preliminary hearing, because he felt strongly that after that point, any plea offers would include prison time. The prosecutor had read the file in Nieto's 2016 case, and he "really wanted to send [Nieto] to prison."

13

The prosecutor was "offended" by Nieto's conduct and the probation violation. The prosecutor was "particularly offended" that officers found over $15,000 in Nieto's house, given that Nieto owed over $40,000 in restitution and had not paid much of that. Koch thought that the evidence against Nieto was "not weak" and was "pretty strong."

Koch knew that Nieto was very concerned about immigration. He also knew that Nieto was in the country illegally and wanted to adjust his immigration status in the future. During plea negotiations, Koch contacted an attorney friend who had experience in immigration law. They spoke for 15 to 30 minutes. He asked his friend what kind of charges would be fatal for immigration, and his friend advised him to avoid a sales charge and a prison sentence. His friend said that "[t]his other drug charge" was "better" than a sales charge "but still not great for immigration." Koch was "honest and described the situation for" Nieto. He told Nieto that a conviction under Health and Safety Code section 11366 was better for immigration purposes than the sales offense, but it still "could be bad for immigration" in that it could lead to deportation and denial of naturalization. He also told Nieto that he believed Nieto would end up with a prison sentence if the case proceeded past the preliminary hearing, which Koch thought was "really bad," because that would make the offense an aggravated felony for immigration purposes. Koch understood that an aggravated felony was particularly damaging because it could lead to mandatory deportation. Koch knew that the sales charge was considered an aggravated felony, but he could not recall whether his friend told him that a conviction under Health and Safety Code section 11366 was also considered an aggravated felony.

14

But he believed that the sales charge was the more serious of the two. Koch had never heard of "the unspecified controlled substance defense."

Nieto chose to accept the plea deal, and Koch went over the plea form with him, including the section regarding immigration consequences. Nieto did not seem happy and would have been much happier if Koch could have gotten the case dismissed. But the prosecutor did not want to dismiss the case or agree to a nondrug charge. The prosecutor wanted some sort of drug conviction, so Koch proposed a possession charge. The prosecutor rejected that offer. If a nondrug charge were an option, Koch would have continued the case and had a longer conversation with his immigration attorney friend about specific alternatives.

Koch went back to the prosecutor three or four times to get an offer that did not include prison time. He got the prosecutor to agree to 270 days in custody, down from the initial offer of 16 months or two years, and Nieto was happy about that. Koch believed that he had negotiated the best deal possible, given that Nieto was on probation, he was facing new charges, and the prosecutor thought that the 2016 conviction was "aggravated to begin with."

D. *Court's ruling*

The court denied both motions to vacate the convictions. The court ruled that Nieto failed to establish he did not meaningfully understand the immigration consequences of his pleas. The court found that on the contrary, Nieto understood the immigration consequences. It observed that Vega credibly testified that he discussed the immigration consequences of the 2016 plea with Nieto. In addition, Koch credibly

15

testified that he informed Nieto of the "significant immigration consequences" of his 2019 plea. The court noted that Vega's and Koch's testimony was consistent with the plea forms, in which Nieto initialed the sections advising him of possible immigration consequences.

The court also ruled that Nieto failed to establish "that he would not have entered the pleas even had he known about those consequences in more detail than he already [did], notwithstanding the fact that he did understand the consequences, in the Court's view."

DISCUSSION

I.    *Denial of motion to exclude witnesses from the courtroom*

Nieto argues that the court erred by denying his motion to exclude Vega and Koch from the courtroom during Nieto's testimony. The argument lacks merit.

"[T]he court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." (Evid. Code, § 777, subd. (a).) "The purpose of the order is to prevent tailored testimony and aid in the detection of less than candid testimony." (*People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) We review the court's ruling for abuse of discretion. (*People v. Tully* (2012) 54 Cal.4th 952, 1004.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Nieto contends that the court's ruling was irrational because the court prejudged Vega's and Koch's credibility when it concluded that the witnesses' presence did not

16

carry any significant risk of causing them to be less than candid. We are not persuaded that the court's explanation of its reasoning shows that it had prejudged credibility. The court merely stated its ruling in terms of the relevant legal standard, demonstrating its familiarity with the case law on the topic.

In any event, assuming for the sake of argument that the court erred, Nieto fails to carry his burden of showing prejudice. He argues that the claimed error denied him due process and is reversible per se. Courts have identified "a small number of 'structural' errors at trial—i.e., 'structural defect[s] affecting the framework within which the trial proceeds'—that are reversible per se." (*People v. Tena* (2007) 156 Cal.App.4th 598, 612.) But Nieto's conclusory assertions do not establish that the claimed error should be treated like a structural error at trial. (See *People v. Lee* (2015) 242 Cal.App.4th 161, 178 ["An error in the refusal to exclude a member of the public from a trial is not a structural error"].)

Instead, Nieto must show that it is reasonably probable that he would have obtained a more favorable result in the absence of the claimed error. (*People v. Taylor* (1982) 31 Cal.3d 488, 499; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1322 [denial of motion to exclude victim-witnesses from the courtroom was not prejudicial]; *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 536 [appellants had not shown that granting the motion to exclude witnesses from the courtroom resulted in prejudice].) There is no such reasonable probability. That is because Vega and Koch had notice of Nieto's anticipated testimony: Nieto's declarations in support of the motions were materially consistent with his testimony at the hearing. If Vega and Koch were inclined

17

to tailor their testimony to refute Nieto's description of the relevant events, then they could have used his declarations to do that. It thus is not reasonably probable that their absence during Nieto's testimony would have led to a more favorable result for Nieto.

For these reasons, Nieto fails to establish that the court prejudicially erred by denying his motion to exclude Vega and Koch from the courtroom.

II.     *Denial of motions to vacate the convictions*

Nieto argues that the court erred by denying both motions to vacate the convictions. We disagree.

Section 1473.7, subdivision (a)(1) provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction" if it "is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."

The movant must show three things. First, they must show that they did not meaningfully understand the immigration consequences of their plea. (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).) Second, they must show that their misunderstanding constituted prejudicial error. (*Ibid*.) And third, they must show that the conviction or sentence being challenged currently is causing "or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (e)(1).) The movant must establish their entitlement to relief by a preponderance of the evidence. (§ 1473.7, subd. (e)(1).)

18

We independently review whether a movant has demonstrated entitlement to relief under section 1473.7, subdivision (a)(1). (*Espinoza*, *supra*, 14 Cal.5th at pp. 319-320; *People v. Vivar* (2021) 11 Cal.5th 510, 527-528 (*Vivar*).) "Independent review in this context is not synonymous with de novo review. [Citation.] We exercise "'independent judgment to determine whether the facts satisfy the rule of law.'"" (*People v. Coca* (2023) 96 Cal.App.5th 451, 458.) "'[W]e weigh all relevant circumstances, with no single factor being dispositive in our consideration of the totality.'" (*Ibid*.) But we "may not simply second-guess factual findings that are based on the trial court's own observations." (*Vivar*, at p. 527.) We "afford 'particular deference to factual findings based on the trial court's personal observations of witnesses.'" (*Coca*, at p. 458.)

A.      *The 2016 grand theft conviction*

The court correctly denied the motion to vacate the grand theft conviction, because Nieto failed to establish that he did not meaningfully understand the immigration consequences of his plea to grand theft.

A noncitizen who is convicted of a crime involving moral turpitude within five years of admission to the United States is deportable, provided that a sentence of one year or longer may be imposed for the offense. (8 U.S.C. § 1227(a)(2)(A)(i).) In addition, a noncitizen convicted of a crime involving moral turpitude generally is inadmissible. (8 U.S.C. § 1182(a)(2)(A)(i)(I); *Mendoza v. Holder* (9th Cir. 2010) 623 F.3d 1299, 1300.)

Grand theft is a crime involving moral turpitude under federal immigration law. (*Rashtabadi v. INS* (9th Cir. 1994) 23 F.3d 1562, 1568; *People v. Curiel* (2023) 92 Cal.App.5th 1160, 1173.) And grand theft is a wobbler offense that may be punished by

19

imprisonment for 16 months, two years, or three years. (§§ 17, subds. (a)-(b), 489.) Nieto was convicted of grand theft within five years of his admission to the United States. The conviction therefore rendered him deportable and inadmissible.

The record establishes that Vega correctly advised Nieto of those consequences. Vega was experienced in immigration law when he represented Nieto. He remembered Nieto's case because the charged offenses involved an unusual level of sophistication. He testified that he understood that grand theft was a crime involving moral turpitude, rendering Nieto deportable and inadmissible. Vega had consulted the ILRC guide regarding the consequences of a grand theft conviction, and the trial court admitted the relevant pages of that guide into evidence. The guide indeed indicated that grand theft was a crime involving moral turpitude, which rendered a noncitizen in Nieto's position deportable and inadmissible.

Vega accordingly advised Nieto that he was already removable because he was "out of status," and the grand theft conviction would render him deportable and inadmissible. Nieto responded with something to the effect of, "'I'll take care of that if and when it happens.'" Vega went over the plea form with Nieto, including the section stating that the plea "will" have immigration consequences, and Nieto acknowledged that section of the form by initialing it. Vega also handwrote "Possible immigration consequences" in another section of the form discussing other consequences of the plea, and Nieto acknowledged that section too. The court expressly found Vega to be credible, a finding that is entitled to deference. (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.) All of

20

the foregoing evidence amply supports the conclusion that Nieto meaningfully understood the consequences of his plea.

Nieto's arguments to the contrary are unpersuasive. Nieto asserts that Vega's testimony failed to establish that Vega explained the immigration consequences in detail. On the contrary, Vega testified that he gave Nieto specific and very detailed advice about the immigration consequences. Nieto also asserts that Vega's testimony was not trustworthy because Vega observed Nieto's testimony before testifying. But the court knew that when it made its credibility finding. We have no reason to doubt that the court factored that information into its decision, along with all of its personal observations of Nieto and Vega. Vega's presence during Nieto's testimony does not convince us that we should not defer to the court's credibility finding.

For these reasons, Nieto failed to show that he did not meaningfully understand the immigration consequences of his grand theft plea. We therefore need not determine whether he showed that any misunderstanding constituted prejudicial error.

B.      *The 2019 controlled substance conviction*

Nieto's understanding of his plea to the controlled substance offense is a different matter. He showed that he did not meaningfully understand the immigration consequences of his plea to that offense. However, he failed to show that the misunderstanding constituted prejudicial error. The court therefore correctly denied the motion to vacate the conviction.

21

### 1. *Nieto's understanding of the immigration consequences*

A conviction for opening or maintaining a place for unlawfully selling controlled substances (Health & Saf. Code, § 11366) is an aggravated felony under federal immigration law. (*Salviejo-Fernandez v. Gonzales* (9th Cir. 2006) 455 F.3d 1063, 1067-1068.) The initial charge against Nieto, possession for sale of MDMA (Health & Saf. Code, § 11378), also qualifies as an aggravated felony. (*United States v. Verduzco-Rangel* (9th Cir. 2018) 884 F.3d 918, 923; 21 C.F.R. § 1308.11(d)(11).) An aggravated felony conviction carries the harshest immigration consequences. Ordinarily, if a noncitizen is found to be deportable, then they may ask the Attorney General for certain forms of discretionary relief from removal, such as asylum and cancellation of removal. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187 (*Moncrieffe*).) But a noncitizen convicted of an aggravated felony is both deportable and ineligible for those discretionary forms of relief.[4] (*Ibid.*)

The record shows that Nieto did not meaningfully understand those consequences. He testified that Koch merely told him that the offense to which he pled (Health & Saf. Code, § 11366) was better for immigration purposes than possession for sale. Koch similarly testified that he told Nieto the plea offense was better for immigration purposes than possession for sale. That was incorrect—both are aggravated felonies for

---

[4] There are forms of nondiscretionary relief that may be available to noncitizens convicted of aggravated felonies, but those forms of relief "require the noncitizen to show a greater likelihood of persecution or torture at home than is necessary for asylum." (*Moncrieffe*, *supra*, 569 U.S. at p. 187, fn. 1 [discussing withholding of removal and deferral of removal for noncitizens convicted of aggravated felonies].)

22

immigration purposes, so one is just as problematic as the other. There is no evidence that Koch understood that or advised Nieto to that effect. Koch said that he knew an aggravated felony was particularly damaging because it could lead to mandatory deportation, and he knew that the possession for sale offense was an aggravated felony. But he could not say that he knew the plea offense was an aggravated felony.

Moreover, there is no other evidence that Nieto understood that he was pleading to an aggravated felony or that such a conviction triggered the harshest immigration consequences. The plea form stated only that his plea "may, and for certain offenses will," result in deportation, exclusion from admission, and denial of naturalization. Koch said that he told Nieto the plea offense "could be bad for immigration" in that it could lead to deportation and denial of naturalization. None of that shows that Nieto meaningfully understood that he would be deportable and also ineligible for discretionary forms of relief. In short, even if we defer to the trial court's finding that Koch's testimony was credible, the record shows that Koch misunderstood the immigration consequences of Nieto's plea, so he could not have given Nieto a meaningful understanding of them.

### 2. *Prejudicial error*

Nevertheless, the court did not err by denying Nieto's motion, because he failed to carry his burden of establishing prejudice.

Prejudice for these purposes means "a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.) "'Factors

23

particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' [Citations.] Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. [Citation.] These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at pp. 320-321.)

To carry their burden of showing prejudice, the "defendant must provide '"objective evidence"' to corroborate factual assertions. [Citation.] Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, *supra*, 14 Cal.5th at p. 321; accord *Vivar*, *supra*, 11 Cal.5th at p. 530 ["when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with '"objective evidence"'"].)

Nieto testified that he would have rejected the plea and fought the controlled substance case if he had meaningfully understood the immigration consequences. As for objective evidence corroborating that assertion, he argues that he established significant ties to the community. "Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family,

24

friends, or the community; work history or financial ties; or other forms of attachment." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.)

The record shows that Nieto had some ties to the United States, but that evidence is not particularly strong. At the time of the plea, he had lived in the country for roughly six years. He lived with his partner and presumably his minor children, the youngest of whom was born in the United States. He appeared to have a circle of friends; he submitted five character reference letters from them. And he had a job at the time of the 2016 plea, although it is unclear what that was, how long he had the job, and whether he still had it at the time of the 2019 plea.

Other exhibits in support of Nieto's motion included the 2021 grant deed, the 2022 paperwork for the California corporation, and the 2023 mortgage statement. That evidence shows that Nieto continued to establish ties after his plea in 2019. But given that those ties did not exist when he pled, they are not strong evidence that he would have rejected the plea in 2019. Moreover, he does not lack connections to Colombia. His partner and two of his children were born there, and his parents and extended family live there. As for his family's immigration status, Nieto was in the country unlawfully after he overstayed his tourist visa. There is no evidence that his wife and two oldest children were in this country lawfully. He testified that he was applying for a U visa because his daughter was a rape victim. Assuming that the rest of his family also had applied for a U visa, the record does not show whether those applications have been granted.

Overall, Nieto showed some ties to the United States, but the evidence is not nearly as compelling as the evidence of defendants' ties in other cases. For instance, in

25

*Espinoza*, the defendant had lived in California for 23 years at the time of his plea. (*Espinoza*, *supra*, 14 Cal.5th at p. 322.) He had been a lawful permanent resident for roughly 17 years, and his wife and children were United States citizens and lived in California all of their lives. (*Id*. at pp. 317, 322.) He was the financial provider for his family and had started his own business after working for others for many years. (*Id*. at pp. 318, 322.) His parents and siblings also lived in the United States. (*Id*. at p. 322.) Those "deep and long-standing ties" weighed in favor of finding prejudicial error. (*Id*. at p. 323.) Similarly, in *Vivar*, the defendant entered this country at age six as a lawful permanent resident. (*Vivar*, *supra*, 11 Cal.5th at p. 517.) At the time of his plea, he had lived here for 40 years. (*Id*. at p. 530.) His wife, two children, and two grandchildren were all United States citizens who lived in California. (*Ibid*.) The defendant had "virtually no ties to Mexico," his birth country, and "spoke Spanish 'like an American.'" (*Ibid*.) He "found it 'difficult to function in Mexican society because people treat [him] like an outsider.'" (*Ibid*.) Those "robust ties" constituted objective evidence corroborating his assertion that he would not have entered his plea if he had known that it would require his deportation. (*Id*. at pp. 517, 530.) Nieto's ties exist, but they are not similarly robust or deep and long standing.

Besides the evidence of Nieto's ties to this country, there was evidence that avoiding deportation was important to Nieto. Nieto testified that his immigration status was the "most important thing to" him. Koch testified that Nieto was very concerned about immigration and wanted to able to adjust his immigration status in the future. Nieto also testified that he had faced persecution by a paramilitary group in Colombia

26

and feared for his life if he returned. But he filed an untimely application for asylum nearly seven years after arriving in the United States, after his immigration court proceedings had begun. (See *Cong Xian Lin v. Holder* (9th Cir. 2010) 610 F.3d 1093, 1095-1096 [asylum applicants must demonstrate that they filed the application within one year after arrival].) That evidence shows that seeking asylum was not a priority for him and thus undermines his claims about persecution from the paramilitary group.

Nieto further argues that he demonstrated prejudice because Koch was unaware of a certain immigration-safe strategy, "the unspecified controlled substance defense," and failed to advise Nieto of the strategy. The claims bear on "whether alternative, immigration-safe dispositions were available at the time of the defendant's plea." (*Espinoza*, *supra*, 14 Cal.5th at p. 323.) But Nieto makes no attempt to explain the unspecified controlled substance defense, and the only evidence he points to is the testimony that Koch was unaware of the defense. Like every other factor showing prejudice, the availability of immigration-safe dispositions must be supported by evidence. (See *id*. at pp. 321, 324 [the defendant offered a declaration from an immigration law expert showing that there were alternative pleas that would not have resulted in mandatory deportation]; *Vivar*, *supra*, 11 Cal.5th at p. 531 ["the uncontradicted declaration from Vivar's immigration expert stated that Vivar could've entered such a plea without subjecting himself to mandatory deportation"].)

The evidence in the record regarding the unspecified controlled substance defense indicates that the defense was unavailable to Nieto. The court admitted certain pages of the ILRC guide into evidence. On one of those pages, the guide states that some

controlled substance offenses (Health & Saf. Code, §§ 11350-11352, 11377-11379) refer to substances that are not in the federal schedules of controlled substances. The guide further explains: "[I]f a defendant's record of conviction does not reveal *which* substance was involved in their offense, there is no proof that it was a federally defined substance, and therefore no proof that it is a controlled substance conviction for immigration purposes. For that reason, one criminal defense strategy has been to create an inconclusive 'record of conviction' that does not name a specific substance." The guide goes on to note that the defense is available to legal permanent residents who are not already deportable, because ICE has the burden of proving that they are deportable, and ICE therefore must prove the conviction involved a federally defined substance. The inconclusive record may prevent ICE from carrying its burden. The guide explains that in contrast, the defense is not available to noncitizens who are removable because they are undocumented. Those individuals "need to apply for some immigration 'relief' in order to stay in the U.S. The inconclusive record defense will *not* help them do that." (See *Pereida v. Wilkinson* (2021) 592 U.S. 224, 227, 231, 141 S.Ct. 754, 758, 760-761 [applicants for relief from a lawful removal order have the burden of proving that "they do not stand convicted of a disqualifying criminal offense," and ambiguity on that point defeats the application for relief].)

The record shows that Nieto was not a legal permanent resident and was removable because he had overstayed his tourist visa. He therefore needed to apply for some relief from removal. According to the ILRC guide, an inconclusive record that does not specify the controlled substance involved in his offense would not have helped

28

him.  In short, there is no evidence that the unspecified controlled substance defense offered an available, immigration-neutral disposition for Nieto, and the only evidence on the point indicates that the defense would not be available.

Moreover, Nieto does not address any of the subfactors relevant to "whether alternative, immigration-safe dispositions were available" at the time of his plea. (*Espinoza*, *supra*, 14 Cal.5th at p. 323.)  Those factors "include the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, [and] the district attorney's charging policies with respect to immigration consequences."  (*Ibid.*)  Several of those factors weigh against a finding of prejudice.

First, Nieto had a criminal record—the 2016 conviction for grand theft.  Lack of a criminal record "is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences."  (*Espinoza*, *supra*, 14 Cal.5th at p. 324.)  Although Nieto's criminal record was not extensive, the prior conviction worked against him.  Nieto was on probation for the 2016 conviction when he committed the 2019 offenses.  According to Koch, the prosecutor had reviewed the file in the 2016 case, and he was "offended" by Nieto's conduct and probation violation.  In particular, the prosecutor was offended by the large amount of cash found in Nieto's home and Nieto's failure to pay much of the restitution ordered in the 2016 case.  The prosecutor viewed Nieto's prior conviction as aggravated, and he was unwilling to agree to a nondrug charge.  That record does not suggest that the prosecutor would have been sympathetic

29

regarding the immigration consequences for Nieto or willing to offer an immigration-neutral alternative.

Second, with respect to the strength of the prosecution's case, Koch assessed that case as strong. That assessment was supported by the police report. The number of pills, their packaging in 10-pill increments, the amount of extra packaging, and the large amount of cash suggested that Nieto possessed the MDMA for sale. His wife's claim that the pills were for her personal use was not credible, given that she could not accurately describe the number of pills or their appearance. And Nieto does not argue that he had any other defenses to the possession for sale charge.

Finally, Nieto does not address other factors bearing on the prejudice analysis, such as the "probability of obtaining a more favorable outcome if he had rejected the plea" and "the difference between the bargained-for term and the likely term if he were convicted at trial." (*Espinoza*, *supra*, 11 Cal.5th at p. 320.) Those factors weigh against a finding of prejudice as well. The strength of the prosecution's case indicates that if Nieto had rejected the plea and gone to trial, it was very unlikely that he would have obtained a more favorable outcome. Rather, he still would have been convicted of an aggravated felony under immigration law, and he also would have faced a much more significant term of imprisonment. The possession for sale charge was punishable by a 16-month, two-year, or three-year term. (Health & Saf. Code, § 11378; Pen. Code, § 1170, subd. (h)(1).) The other felony charges in the complaint likewise were punishable by a 16-month, two-year, or three-year term. (§§ 470b, 472-473, 484i, subd. (c), 1170, subd. (h)(1).) And as regards the probation violation in the 2016 case, the

court was not required to reinstate Nieto's probation. (§ 1203.2, subd. (c).) It had the power to revoke and terminate probation and impose a sentence for grand theft (*ibid*.), an offense that also was punishable by a 16-month, two-year, or three-year term. (§§ 489, 1170, subd. (h)(1).) By comparison, three years of probation, 270 days of jail time, and reinstatement of probation in the 2016 case "offer[ed] significant benefits over the probable consequences of proceeding to trial." (*People v. Martinez* (2013) 57 Cal.4th 555, 564.)

Nieto's remaining argument is that his ineligibility for a U visa demonstrates prejudice. Again, Nieto testified that he was applying for a U visa on the ground that his daughter was a victim of rape. His ineligibility for the U visa establishes the third element that he must prove—that the controlled substance conviction "is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (e)(1).) But Nieto does not explain how the U visa application demonstrates prejudice, that is, a reasonable probability that he would have rejected the plea. That is because the record contains no evidence regarding when the crime against his daughter occurred or when he applied for the U visa. During argument, Nieto's counsel stated that the rape occurred when the child was 13 years old. Counsel's argument is not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11.) But even if we were to consider the statement as evidence, the oldest daughters' birth certificates show that one was born in March 2007, and the other was born in December 2008. They would have turned 13 years old in 2020 and 2021,

31

after Nieto pled in 2019. Nieto does not explain how a crime that had not yet occurred could have led him to reject the plea in 2019.

On balance, we conclude that Nieto failed to show a reasonable probability that he would have rejected the plea to the controlled substance offense if he had understood the immigration consequences. He offered evidence of some ties to the United States and evidence that his immigration status was important to him. But his evidence does not address numerous other factors bearing on the prejudice analysis. In particular, there is no evidence that he had reason to believe an immigration-neutral negotiated disposition was possible, and the strength of prosecution's case as well as Nieto's criminal record suggest that such an alternative was not available. In light of the lack of alternatives, the plea deal offered significant benefits over the probable consequences of proceeding to trial.

For all of these reasons, we conclude that the court did not err by denying Nieto's motion to vacate the controlled substance conviction. Nieto demonstrated that he did not meaningfully understand the consequences of his plea, but considering the totality of the circumstances, he failed to show prejudicial error.

DISPOSITION

The orders denying Nieto's motions to vacate his convictions are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:


MILLER
ACTING P. J.


FIELDS
J.